Geraldine SNELL, Miriam Ramos and Juan Malave, Individually and on Behalf of their minor children, and on Behalf of all other Parents of needy, dependent children, and Robert Whaley, Individually and on Behalf of all Others Similarly Situated, Plaintiffs,

v.

George K. WYMAN, as Commissioner, New York State Department of Social Welfare, Mitchell Ginsberg, as Commissioner New York City Department of Welfare, Edna Lisle, as Director and Clara K. Linet as Supervisor, Fort Green Center, New York City Department of Welfare, Defendants.

No. 67 Civ. 2676.

United States District Court
S. D. New York.

Feb. 29, 1968.

Martin Garbus, James J. Graham, New York City, for plaintiffs.

Louis J. Lefkowitz, Atty. Gen., of the State of New York, for defendant Wyman; Maria L. Marcus, Asst. Atty. Gen. of counsel.

J. Lee Rankin, Corp. Counsel, City of New York for defendant Ginsberg.

Before KAUFMAN, Circuit Judge, and METZNER and FRANKEL, District Judges.

## OPINION

FRANKEL, District Judge.

The welfare laws and administrative regulations of New York State contain provisions, more particularly described below, which impose upon welfare recipients an obligation to repay the cost of assistance benefits out of specified kinds of assets. The plaintiffs, who have received and are receiving various forms of welfare payments, brought this suit for declaratory and injunctive relief, urging that such provisions are invalid and unenforceable on one or more of several federal constitutional grounds. Predicating federal jurisdiction upon 42 U.S.C. § 1983 and 28 U.S.C. §§ 1331(a),

1343(3) and (4), 2201 and 2202, plaintiffs moved for the convening of a three-judge court under 28 U.S.C. § 2281. The motion was granted. Thereafter, plaintiffs took some depositions, and the parties entered into two stipulations. The result of these steps is a record which, in the view of the court as well as the litigants, adequately poses the constitutional issues upon undisputed facts. Both sides have moved for summary judgment. For the reasons hereafter stated, the court will grant defendants' motion and dismiss the complaint.

## I.

The problems of the plaintiffs which brought them to the welfare authorities and then to this court—problems which cannot fail to evoke profound sympathy from fellow humans, whether or not they warrant revision of New York law by federal judges—may be summarized as follows:

Plaintiff Geraldine Snell is thirty-three years old, divorced, mother of four children ranging from four to seventeen years of age. She owns an equitable interest, worth about $900 as of September 1, 1967, in a three-room cooperative apartment where she and her children reside. She has a regular, part-time clerical job at which she earns net wages of some $32 per week. Pursuant to court order, she receives $25 weekly from her first husband toward the support of the children. Her second husband, from whom she was divorced in 1966, contributes nothing for her support or the children's. Since September 1965 (financed by state and private scholarship funds), she has been enrolled in a course of full-time college study, scheduled for completion in June of 1969, after which she hopes to pursue a teaching career.

In February of 1967, Mrs. Snell applied and was found eligible for benefits under the state program of Aid to Families with Dependent Children (AFDC).[1] She receives currently what is described in the papers as "a complete, regular budget allowance."

Purporting to act under sections 104[2] and 360[3] of the New York Social Serv-

---

1. The program is one encouraged and financed in substantial part by grants-in-aid from the federal government authorized by 42 U.S.C. §§ 601–609 (1964), as amended (Supp.1967), "[f]or the purpose of encouraging the care of dependent children in their own homes or in the homes of relatives * * * to help maintain and strengthen family life and to help such parents or relatives to attain or retain capability for the maximum self-support * * *." 42 U.S.C. § 601. To receive federal funds under the AFDC categorical assistance program, New York State was required to submit a "state plan" for approval by the Secretary of Health, Education and Welfare, 42 U.S.C. §§ 601, 602. It appears that the State of New York has complied with this requirement, and there is no indication that the Secretary has disapproved the state plan in any relevant respect. AFDC grants are dispensed according to minimum standards of eligibility and administration set by the Social Security Act and by state statutes that determine the level of need and otherwise define the classes of eligible families. See N.Y. Social Services Law, McKinney's Consol. Laws, c. 55 § 343 et seq.

2. "§ 104. *Recovery from a person discovered to have property*
   "1. A public welfare official may bring action or proceeding against a person discovered to have real or personal property, or against the estate or the executors, administrators and successors in interest of a person who dies leaving real or personal property, if such person, or any one for whose support he is or was liable, received assistance and care during the preceding ten years, and shall be entitled to recover up to the value of such property the cost of such assistance or care. Any public assistance or care received by such person shall constitute an implied contract. No claim of a public welfare official against the estate or the executors, administrators and successors in interest of a person who dies leaving real or personal property, shall be barred or defeated, in whole or in part, by any lack of sufficiency of ability on the part of such person during the period assistance and care were received.

   "Nor shall the claim asserted by a public welfare official against any person under this section be impaired, impeded, barred

3. See Note 3 on page 856.

ices Law and accompanying regulations,[4] New York welfare officials took from Mrs. Snell a "Pledge Agreement" and "Assignment of Proceeds of Sale" relating to her cooperative apartment. Under the terms of these instruments, Mrs. Snell has obligated herself to repay the cost of all public assistance and care currently being supplied to her and her children, the obligation being secured by her interest in the cooperative apartment and the Commissioner of Welfare being

or defeated, in whole or in part, on the grounds that another person or persons may also have been liable to contribute. "In all claims of the public welfare official made under this section the public welfare official shall be deemed a preferred creditor.

"2. No right of action shall accrue against an infant by reason of the assistance or care granted to him unless at the time it was granted the infant was possessed of money and property in excess of his reasonable requirements as described in section one hundred one."

3. "§ 360. *Real property of legally responsible relatives; deeds and mortgages may be required*

"1. The ownership of real property by an applicant or applicants, recipient or recipients who is or are legally responsible relatives of the child, children, minor or minors for whose benefit the application is made or the aid is granted, whether such ownership be individual or joint as tenants in common, tenants by the entirety or joint tenants, shall not preclude the granting of aid to dependent children or the continuance thereof if he or they are without the necessary funds to maintain himself or themselves and such child, children, minor or minors. The public welfare official may, however, require, as a condition to the granting of aid or the continuance thereof, that he be given a deed of or a mortgage on such property in accordance with the provisions of section one hundred six.

"2. However, while the property covered by the deed or mortgage is occupied, in whole or in part, by the responsible relative who gave such deed or mortgage to the public welfare official or, during his minority, by a child or minor for whose benefit the aid was granted the public welfare official shall not sell the property or assign or enforce the mortgage without the written consent of the department; and, when the property is occupied by such child or minor, such consent shall not be given unless it appears reasonably certain that the sale or other disposition of the property will not materially adversely affect the welfare of such child or minor during his minority.

"3. The net amount recovered by the public welfare department from such property, less any expenditures approved by the department for the burial of the relative, the child or minor who dies while in receipt of aid under this title, shall be used to repay the public welfare district, the state and the federal government their proportionate share of the cost of aid to dependent children granted. The state and federal share shall be paid by the public welfare district to the state and the manner and amount of such payment shall be determined in accordance with the regulations of the department.

"4. If any balance remains it shall belong to the estate of the legally responsible relative or relatives, and the public welfare district shall forthwith credit the same accordingly, and, provided they claim it within four years thereafter, pay it to the persons entitled thereto. If not so claimed within four years it shall be deemed abandoned property and be paid to the state comptroller pursuant to section thirteen hundred five of the abandoned property law.

"5. The proceeds or moneys due the United States shall be paid or reported in such manner and at such times as the federal security agency or other authorized federal agency may direct."

4. "Eligibility for ADC shall be determined for each applicant in accordance with the policies and procedures generally applicable in public assistance. This determination shall include consideration of each of the following factors of eligibility: financial need, age, welfare of child or minor, residence within the State, living arrangements, relationship of child to relative, and deprivation of parental support or care. Where there is emergent need and a presumption of categorical eligibility the preinvestigation grant procedure shall be followed.

"(a) *Financial need.* Financial need shall be determined in accordance with approved standards of assistance. A public welfare official may in his discretion require the assignment of real property or other resources of an applicant or recipient who is a parent of the child or minor for whose benefit an ADC grant is made. Refusal by the applicant to assign shall constitute ineligibility for public assistance." New York Dept. of Social Services Reg. § 18–369.2.

empowered (subject to authority from the State Welfare Department, Social Services Law § 360(2), supra note 3) to sell the apartment and apply the proceeds to his claim for assistance furnished. According to the terms of section 360(2), supra note 3, the mortgage may not be enforced or assigned without the written consent of the State Department of Social Services while the apartment is occupied by Mrs. Snell and her children, and, further, "such consent shall not be given unless it appears reasonably certain that the sale will not materially adversely affect the welfare" of the Snell children.

Plaintiff Miriam Ramos is the nineteen-year-old mother of three children, all under the age of three, who are dependent upon her alone for support. Her husband is in jail. Since 1963 Mrs. Ramos has been a recipient of AFDC benefits. On February 26, 1967, Mrs. Ramos and her oldest child were injured in an automobile accident. Three months later she was requested, as a condition to her continued receipt of public assistance, to execute an "Assignment of Proceeds of Lawsuit," a document which assigns (to the extent of assistance received) to the Department of Social Services the proceeds of any personal injury claim arising out of the accident. The assignment was taken pursuant to the general obligation set out in N.Y. Social Services Law § 104,[5] and the more specific authority of § 104-a.[6]

5. See note 2 supra.

6. "§ 104-a. *Liens for public assistance and care on claims and suits for personal injuries.*

"1. If a recipient of public assistance and care shall have a right of action, suit, claim, counterclaim or demand against another on account of any personal injuries suffered by such recipient, then the public welfare official for the public welfare district providing such assistance and care shall have a lien for such amount as may · be fixed by the public welfare official not exceeding, however, the total amount of such assistance and care furnished by such public welfare official on and after the date when such injuries were incurred.

"The welfare commissioner shall endeavor to ascertain whether such person, firm or corporation alleged to be responsible for such injuries is insured with a liability insurance company, as the case may be, and the name thereof.

\*   \*   \*   \*   \*   \*   \*

"10. The provisions of this section shall not be deemed to adversely affect the right of a public welfare official who has taken an assignment of the proceeds of any such right of action, suit, claim, counterclaim or demand, to recover under such assignment the total amount of assistance and care for which such assignment was made.

\*   \*   \*   \*   \*   \*   \*

"12. The provisions of this section to the contrary notwithstanding, the public welfare official may in his discretion release to the injured person an amount not to exceed the cost of two years' maintenance from the lien herein created.

"This section shall not apply to any claim or award which is or may be allowed pursuant to the provisions of the workmen's compensation law or the volunteer firemen's benefit law."

The assignment technique is more specifically authorized by Policies Governing the Administration of Public Assistance, City of New York, Department of Welfare § 184:

"When a recipient or any member of the family receiving public assistance sustains or has sustained a personal injury, the Department shall determine whether legal action has been or can be instituted. The potential proceeds of a personal injury action or death claim are subject to the following:

"a. *Protective Action.* The potential proceeds of the recipient's action shall be subject to protective action through an assignment. When an assignment of the proceeds of a recipient's personal injury or death claim is taken by the Department, any monies becoming available are subject to the Department's claim to the extent of the net proceeds.

"b. *Disposition of Funds on Recovery or Settlement.* Upon a recovery or settlement, the recipient may pay, out of the gross proceeds, an amount sufficient to meet the attorney's fees, medical costs related to the injuries, hospital liens and all other expenses and disbursements incident to the injury. The net proceeds are applied towards the repayment of public assistance granted. The Department may permit

The third plaintiff, Juan Malave, is the father of eight minor children. He earns $86 weekly and is the sole support of his wife and family. Prior to 1967 Mr. Malave had received AFDC benefits for brief periods, in 1955 and 1965. However, in March, 1967, he suffered personal injuries on the premises of the public housing project where he lives, and was unable to continue working; for several months the family received emergency AFDC assistance and disability insurance checks. In March, 1967, plaintiff Malave received $400 from the New York City Housing Authority as compensation for his injuries. These funds have been exhausted in providing necessities for the family.

The New York recovery provisions have been applied to Mr. Malave in the following ways: by requiring the endorsement over to the Department of Social Services of one of three disability insurance checks; and by asserting on June 13, 1967, a "Notice of Lien" in the amount of $420.29 for assistance furnished since the accident and after the receipt of the Notice. The same provisions invoked against plaintiff Ramos were the claimed authority in the case of Mr. Malave.[7]

Plaintiff Helen Marley is a sixty-eight year old chambermaid who has worked for the YWCA since 1954. She currently earns $30 for a twenty-hour work week and supports herself solely on this salary and Social Security benefits totalling $86 a month. Her only asset is a $600 bank account.

In 1943 Miss Marley became ill with cancer, and from 1945 to 1954 she was sustained on public assistance totalling $4,000. During this time of sickness and despondency, she assigned to the Department of Social Services an insurance policy on her life. With the help of a cousin Miss Marley finished paying the premiums on this policy in 1967. However, the insurance company will not release the proceeds of the policy to plaintiff Marley because of the prior assignment to the Department of Social Services. The statutory authority for the public welfare official's action is section 105 of the Social Services Law.[8]

Robert Whaley is a twenty-six year old welfare recipient who lost his right leg in an accident on a New York City subway platform on July 31, 1966. Prior to this misfortune plaintiff Whaley earned his living as a free-lance photographer, a career which he hopes to resume. Eleven months after the accident, on June 30, 1967, Mr. Whaley applied for assistance in the form of Aid to the Permanently and Totally Disabled (APTD).[9] As a condition to granting

the recipient to retain, out of the net proceeds, an amount equal to two years' budget needs computed on a public assistance basis disregarding any income. "The decision to authorize the release of funds equal to two years' budget needs requires special approval.

"When the release of such funds would be inadvisable, or when fraud or concealment of assets has occurred, the Department reserves the right to refuse the release of all or part of the two years' budget needs, subject to special approval.

"Funds secured through recovery or settlement of a personal injury action may be used, in appropriate cases, to establish burial reserves * * *."

7. See note 6 supra.

8. "§ 105.   *Claim on insurance*
"If a person, who has received public assistance or care, shall die leaving insurance, and the estate of the assured is named as beneficiary, or no beneficiary is named, the public welfare official shall be entitled to a preferred claim to be paid out of such insurance to the amount of the cost of such assistance and care, and for funeral expenses not to exceed two hundred fifty dollars. If the insured leaves a widow or minor children who are, or are liable to become, public charges, the public welfare official may, in his discretion, waive his claim to such insurance or any part thereof to which he would otherwise be entitled."

9. APTD is a categorical assistance program operating in the same federal-state type of partnership as that described in

this aid, the Department requested and received, pursuant to section 104–a,[10] an "Assignment of Proceeds of Lawsuit," which imposes the obligation to repay assistance out of the eventual personal injury recovery, if any, that plaintiff receives.

In addition to the foregoing facts, which are not in dispute, plaintiffs have adduced some deposition testimony bearing mainly upon a species of "constitutional fact"—consisting, at least in large measure, of expert judgments designed to show that the New York repayment requirements are onerous, destructive of morale, and, generally, so negative in their impact on effective rehabilitation as to be arbitrary and irrational. Such testimony emanates mainly from Miss Barbara Lounds, a social work consultant, and Dr. Charles Grosser, assistant professor at the New York University School of Social Services, both extensively experienced in working with and for poor people. Among other things, these experts state that assignments of life insurance policies deprive welfare recipients of an effective symbol of independence and accomplishment; that there is similar symbolic import in the family home or apartment; that assignments of personal injury claims breed "tremendous resentment;" and that, in general, "any social work purpose in the recovery provisions is quite beyond * * * comprehension." Moreover, these witnesses testify, enforcement of the recovery requirements tends to cause return to the welfare rolls of people who might otherwise postpone or avoid such renewed dependence.

Also in the record are depositions of the defendant Commissioners—both of whom, as the court may notice, have careers of recognized distinction for scholarship and active service in the field of social work.[11] Both Commissioners acknowledged that there are imperfections in existing welfare programs, and indicated their concern to seek improvements. Commissioner Ginsberg reaffirmed his published view that welfare assistance should be (though it may not be by either the state or federal legislature) viewed "as an entitlement and a right rather than as a handout." Neither found the recovery requirements significant deterrents to seeking welfare benefits though Commissioner Ginsberg listed a variety of reasons (pride, resentment of investigative procedures, etc.) why eligible people fail to apply. Commissioner Wyman expressed the view that the New York repayment requirements, as they are administered and limited, have no adverse effect upon the desire to become self-supporting. Asked if the provisions affirmatively promote this desire, Commissioner Ginsberg said:

"I don't know that they do basically. You have, of course, a dual responsibility.

"One is to the client and the other is to the accountability of the appropriate use of the public funds. * * * I think, this provision goes to the second objective."

---

note 1 relating to AFDC. Federal authorization for the program is found in 42 U.S.C. §§ 1351–1355 (1964), as amended (Supp.1967), one purpose being to enable "each State to furnish financial assistance * * * to needy individuals eighteen years of age and older who are permanently and totally disabled" and to encourage each State "to furnish rehabilitation and other services to help such individuals attain or retain capability for self-support or self-care * * *." 42 U.S.C. § 1351. New York has elected to join the program pursuant to N.Y. Social Services Law § 300 et seq.

10. See supra note 6.

11. Considering the subject matter and where we sit, it may be permissible, too, that we acknowledge an awareness of the sensitive and imaginative efforts with which Commissioner Ginsberg has been seeking to attack the basic needs of welfare "clients"—not least the need for self-respect and independence through productive work. See, e. g., N.Y. Times, Jan. 28, 1968, p. 1, col. 2; id., Jan. 15, 1968, p. 1, col. 4.

## II.

Before stating and ruling upon plaintiffs' contentions, it will be useful to note the dimensions and the context of our problem. On the facts before us, recipients of assistance under the programs involved are subject to three forms of repayment obligation:

(1) A lien on interests they own in real property—specifically, Mrs. Snell's interest in her cooperative apartment.

(2) A lien on potential or actual recoveries for personal injuries—illustrated here in the cases of plaintiffs Ramos, Malave, and Whaley.

(3) An assignment of the interest of an insured recipient in life insurance policies, evidently under New York Social Services Law § 105, which allows for recovery of welfare assistance payments from such policies in cases where "the estate of the assured is named as beneficiary, or no beneficiary is named"—the subject of complaint by plaintiff Marley.

While § 104 of the New York Social Services Law (note 2, supra) appears on its face to authorize public welfare officials to recover "the cost of * * * assistance or care" from any "real or personal property" of the recipient (subject to a 10-year limitations period), authoritative regulations substantially limit this power. Notably, it is provided by regulation, and unequivocally represented to this court, that no such recovery may be sought from wages or salaries or from property acquired with such earnings.[12] This restriction, if we had nothing more before us, could probably be taken as an authoritative confinement of the statutory power, cf. Phyle v. Duffy, 334 U.S. 431, 441, 68 S.Ct. 1131, 92 L.Ed. 1494 (1948); Gerende v. Election Board, 341 U.S. 56, 71 S.Ct. 565, 95 L.Ed. 745 (1951), discussed in Whitehill v. Elkins, 389 U.S. 54, 19 L.Ed.2d 228 (1967), and would probably be enforceable against the welfare authorities in any event, Yellin v. United States, 374 U.S. 109, 121, 83 S.Ct. 1828, 10 L.Ed.2d 778 (1963); Service v. Dulles, 354 U.S. 363, 379–380, 77 S.Ct. 1152, 1 L.Ed.2d 1403 (1957); U. S. ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Bridges v. Wixon, 326 U.S. 135, 153, 65 S.Ct. 1443, 89 L.Ed. 2103 (1945). Moreover, we have no plaintiff before us from whom recovery has been sought out of the fruits of gainful employment and no suggestion in the record that the regulation and representations denying any such practice are not accurate reflections of the facts. Accordingly, whether or not it makes a constitutional difference, it is worth mentioning that none of the provisions plaintiffs attack have any deterrent or discouraging effect upon the incentives of welfare recipients to improve their lot by seeking and engaging in productive employment.

To complete this brief sketch of our context, it may well be of at least some constitutional significance (as we note again below) that provisions for repayment by persons who receive welfare

12. "No referral [for recovery purposes] shall be made if the newly acquired assets consist solely of income from employment." Policies Governing the Administration of Public Assistance, City of New York Department of Welfare (reissued August 1, 1963) § 189.

The uncontradicted deposition testimony of the defendant State Commissioner (at pp. 11, 25, and 27) reports that the policy exempting earnings is state-wide. There is no dispute between the parties on this subject. In any event, we have only City people before us. And none of these plaintiffs claims that his *earnings* have been or will be pursued for recovery. Compare note 27, infra. Judge Kaufman mentions, however, that plaintiff Marley may conceivably have used earnings to pay her insurance premiums. That could be, but she has not said so here nor has she indicated to the administrative officials that the exemption of earnings should inure to her benefit to any degree. We perceive no reason in this state of affairs why a three-judge court should explore further a *conceivable* violation of a regulation which Mrs. Marley neither asserts nor has mentioned to the officials bound by that regulation.

assistance are contained in the laws of some thirty-two states.[13] And the only decisions on the subject disclosed by our research have rejected constitutional attacks generally similar to those mounted by plaintiffs in this case. Lalic v. Chicago, Burlington & Quincy R. R., 263 F.Supp. 987 (N.D.Ill.1967); Newland v. Child, 73 Idaho 530, 254 P.2d 1066 (1953); Beck v. Buena Park Hotel Corp., 30 Ill.2d 343, 196 N.E.2d 686 (1964); Donoho v. O'Connell's Inc., 18 Ill.2d 432, 164 N.E.2d 52 (1960); Dimke v. Finke, 209 Minn. 29, 295 N.W. 75 (1940); Wallberg v. Utah Public Welfare Comm., 115 Utah 242, 203 P.2d 935 (1949).[14]

## III.

█ While plaintiffs' briefs are neither terse nor tightly organized, their constitutional arguments appear ultimately to fall under three headings: first, that the state recovery provisions deny the due process guaranteed by the Fourteenth Amendment; second, that they deny the equal protection of the laws required by that Amendment; and, third, that they conflict with federal social security legislation, thus contravening the Supremacy Clause of Article VI, Clause 2. We consider the arguments in the order stated.[15]

### Due Process

1. *Alleged irrationality of the legislative judgment*

The repayment provisions are said by plaintiffs to be arbitrary, oppressive, and irrational. This is so, they say, because the State, by this requirement, defeats its own stated objective of seeking to make welfare recipients productive and self-supporting. Further, they argue, by demanding liens upon small property interests or contingent rights to recover for personal injuries, the statutes tend to frustrate desire for human dignity and independence. Citing their deposition witnesses expert in the field of social work, they urge that the assignment of real property interests "is disastrous from a social work point of than realty has similar consequences of affronting human dignity and impeding the objective of rehabilitation. Plaintiffs denounce as trivial and insufficient what they find to be the "only conceivable rationale" of these recovery provisions—"to attempt to save the state money." The objective cannot justify the hurt, they say, and is not really served in any case because the amounts recovered are minuscule in comparison with the total of welfare expenditures.[16] Among the vicious consequences of the State's recovery demands, plaintiffs report, is the refusal of people eligible for welfare benefits to apply for them because they are unwilling to have liens put upon their real property, insurance policies, or personal injury claims.

We do not stop to analyze these arguments in particular detail. We note only by the way some patent difficulties in the things plaintiffs say: (1) Their ma-

13. See Leland v. State of Oregon, 343 U.S. 790, 798, 72 S.Ct. 1002, 96 L.Ed. 1302 (1952); and see Characteristics of State Public Assistance Plans Under the Social Security Act, Public Assistance Report No. 50 (U.S. Dept of Health, Education and Welfare 1964 ed.). The cited Report shows laws of this kind for 34 States. Since its issuance, however, two States (Michigan and West Virginia) have repealed their statutes.

14. We are not unaware of the burgeoning problems of bringing legal services to the poor and exploring such relatively untrodden areas as the one here in question. Nor do we suppose that the few precedents "in point" can be taken as dispositive on subjects like this. It would be helpful, nevertheless, when it is proposed to break new constitutional ground, to have briefs which at least mention the pertinent learning already in the books.

15. Before dealing with the merits, defendants urge that this is a case for application of the somewhat diminished doctrine of "abstention." But there appear to be no valid grounds for abstaining, and we have had, since the briefs were filed, controlling authority that compels rejection of this course. See Damico v. California, 389 U.S. 416, 88 S.Ct. 526, 19 L.Ed.2d 647 (1967).

16. For 1966, the briefs tell us, recoveries amounted only to some $5,000,000 as against state welfare expenditures of about $1,200,000,000.

jor thesis that the State has undercut its own statutory objective of rehabilitation is hardly a point going to federal due process. (2) If it mattered, we might doubt the standing of persons accepting assistance to complain that other, unidentified people refuse welfare payments because of the conditions plaintiffs question. (3) There is no point in dwelling upon the repeated suggestion that personal injury recoveries are designed to make people "whole," so that exactions from such funds deny due process by making them less than "whole." It seems sufficient to say that the Constitution we are supposed to expound gives us no authority to follow the figurative trails of metaphors like this.[17]

Apart from such passing observations, we assume that rational men could agree fully with plaintiffs' view that the painful consequences of the recovery statutes outweigh the measurable benefits the State seeks from them. We also accept without questioning the view of the scholar who testified in his deposition that "any social work purpose in the recovery provisions is quite beyond [his] comprehension." The plain flaw that none the less destroys plaintiffs' thesis is that it is brought to the wrong forum. Plaintiffs' complaints might move us to vote for changes if we sat as state legislators. But they do not approach the showing of irrationality or arbitrariness warranting exercise of the limited veto power of the federal judiciary under the Fourteenth Amendment.

Against plaintiffs' views, as defendants point out, there are arguments of policy which can scarcely be dismissed as frivolous, whether or not we would find them convincing if the judgments of policy were for us. The State is entitled, they note, to consider relative need and available resources in distributing its limited welfare funds. Even "trivial" recoveries like $5,000,000 need not be deemed beneath notice. Whether they are correct or not, legislators could plausibly judge that a sense of obligation to contribute or repay if possible serves some function relevant to the concern for human dignity. Moreover, the objectives of rehabilitation and self-support are not seriously impeded at all; by exempting earnings, the statutes, as they are administered, leave wholly unfettered the desire and search for independence through gainful work.

We sketch these countervailing points for the single purpose of indicating what seems plain to us—that we could hold the statutes unconstitutional only if we were invested by the "convenient vagueness" of the Due Process Clause[18] with a power, long since denied us, to invalidate state laws "because they may be unwise, improvident, or out of harmony with a particular school of thought." Williamson v. Lee Optical Co., 348 U.S. 483, 488, 75 S.Ct. 461, 464, 99 L.Ed. 563, (1955); see also Nebbia v. People of State of New York, 291 U.S. 502, 537–538, 54 S.Ct. 505, 78 L.Ed. 940 (1934); Olsen v. State of Nebraska, 313 U.S. 236, 246–247, 61 S.Ct. 862, 85 L.Ed. 1305 (1941); Queenside Hills Co. v. Saxl, 328 U.S. 80, 82–83, 66 S.Ct. 850, 90 L.Ed. 1096 (1946); Day-Brite Lighting, Inc. v. State of Missouri, 342 U.S. 421, 423, 72 S.Ct. 405, 96 L.Ed. 469 (1952); Joseph E. Seagram & Sons, Inc. v. Hostetter, 384 U.S. 35, 47–48, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966). To be sure, cases like those just cited reflect mainly the recognition of our highest Court during the last thirty years or so that it does not sit as final arbiter of state social policies affecting matters of business and industrial regulation. (Note, however, the claims of personal "liberty" involved in Ferguson v. Skrupa, 372 U.S. 726, 729–732, 83

17. Consider the applicant who has no assets except $500,000 recovered to make him "whole" in a personal injury suit. Would anyone suppose a welfare department must, or could, declare him eligible? For constitutional purposes, the hypothetical question of eligibility is not different from the question of personal *injury claims* as sources of potential recovery.

18. Hough, Due Process of Law—Today, 32 Harv.L.Rev. 218 (1919).

S.Ct. 1028, 10 L.Ed.2d 93 (1963); Fay v. People of State of New York, 332 U.S. 261, 281, 294–296, 67 S.Ct. 1613, 91 L.Ed. 2043 (1947); Jacobson v. Commonwealth of Massachusetts, 197 U.S. 11, 28 30–33, 25 S.Ct. 358, 49 L.Ed. 643 (1905).) And, it is said, the subject of welfare administration, where the primitive needs of desperate people are at stake, is altogether different. There is a difference, certainly, but not a constitutional one—not any that commissions us to tell those the people elect how they should resolve competing values of the kind here in question.[19]

It is appropriate from time to time to appreciate the full measure and continued vitality of what Mr. Justice Holmes meant when he said: "The 14th Amendment does not enact Mr. Herbert Spencer's Social Statics." Lochner v. State of New York, 198 U.S. 45, 75, 25 S.Ct. 539, 546, 49 L.Ed. 937 (1905) (dissenting). Now that his dissenting thought has won the day, we ought not to trivialize the achievement by viewing it only as the interment of Spencer's social doctrines. The principle applies to the social philosophers that most of us, including judges, find more persuasive than Spencer. If we were free to enforce what we may modestly deem our more enlightened view, we might seriously consider the changes plaintiffs propose. But we have no such power, and it is better in the end for everyone that this is so.

■ We were reminded only the other day, though the context was different, of the basic principle: "The purpose of

the Constitution and the Bill of Rights, unlike more recent models promoting a welfare state, was to take government off the backs of people." Schneider v. Smith, 390 U.S. 17, 25, 88 S.Ct. 682, 19 L.Ed.2d 799 (1968). The principle counsels that it is not for federal judges to be "liberal" or "conservative" in advancing and ordering measures which undoubtedly relate to basic matters of human decency and welfare. The constricted test in this forum is one of minimal rationality. By that test plaintiffs' due process argument must fail.

## 2. *The charge of vagueness*

There is a suggestion in plaintiffs' brief, somewhat obscurely expressed, that the New York recovery provisions deny due process because of the overbreadth with which they are drawn. The "vagueness" is said to inhere in the grant of discretion by which public welfare officials *"may"* demand assignments, enforce liens, or institute recovery actions. See N. Y. Social Services Law, §§ 104, 104–a, 105, and 360, notes 2, 3, 6, and 8 supra. It is not altogether clear whether the argument is meant as a proposed extension of the void-for-vagueness doctrine as it applies to problems of free expression, e. g., Kunz v. People of State of New York, 340 U.S. 290, 293–294, 71 S.Ct. 312, 95 L.Ed. 280 (1951) and criminal liability, e. g., Lanzetta v. State of New Jersey, 306 U.S. 451, 59 S.Ct. 618, 83 L.Ed. 888 (1939), or whether the claim relates to a supposed excess in delegating power to administrators. On either formulation, the position is not sound.

19. There is no question, of course, that state action respecting welfare is as subject to the Fourteenth Amendment as other exertions of state power. This decision is not rested upon any suggestion that welfare assistance is a "privilege" rather than a "right" and therefore outside the purview of the Due Process and Equal Protection Clauses. Cf. Sherbert v. Verner, 374 U.S. 398, 404–406, 83 S.Ct. 1790, 10 L.Ed.2d 965 (1963); Flemming v. Nestor, 363 U.S. 603, 608–611, 80 S.Ct. 1367, 4 L.Ed.2d 1435 (1960); Schware v. Board of Bar Examiners, 353

U.S. 232, 239 n. 5, 77 S.Ct. 752, 1 L.Ed. 2d 796 (1957); Gonzales v. Freeman, 118 U.S.App.D.C. 180, 334 F.2d 570, 574 (D.C.Cir.1964). See also O'Neill, Unconstitutional Conditions: Welfare Benefits With Strings Attached, 54 Calif.L. Rev. 443 (1966). Our point is the narrower one that the limited right of substantive due process insures only against capriciousness reaching a level of irrationality, not against judgments of policy that may be unwise or even "harsh" in their balancing of competing interests.

**864**

The problem of "delegation," so denominated, may be put quickly to one side. The separation-of-powers principle, however pervasive it may be in American governments, is not in itself enforceable against the States as a matter of federal constitutional law. See Sweezy v. State of New Hampshire, 354 U.S. 234, 255, 77 S.Ct. 1203, 1 L.Ed.2d 1311 (1957).

Viewed as a charge that the state statutes are fatally "vague and standardless," Giaccio v. State of Pennsylvania, 382 U.S. 399, 402, 86 S.Ct. 518, 15 L.Ed.2d 447 (1966), plaintiffs' theory fares no better. To begin with, it is not the case that the public welfare officials are left at large in enforcing the recovery provisions. The statutory complex reveals pertinent criteria,[20] including notably the mandate in Social Services Law § 131(1) that the responsible officials must, "whenever possible, administer such care, treatment, and service as may restore  *  *  * [needy] persons to a condition of self-support or self-care  *  *  *." This guideline would appear, at least in part, to account for the significant exemption, by administrative regulation, for employment earnings.

Apart from the fact that the statutory subject matter provides explicit and implicit considerations to channel the exercise of discretion, plaintiffs' attack upon the existence of such leeway suggests an essentially absurd alternative of mandatory enforcement. Would they, or anyone, be better off if the statutes said welfare officials "must" rather than "may" insist upon recovery in every

case?[21] The rhetorical question calls to mind the numerous and inescapable areas where decisions on the invocation of enforcement powers must be and are confided to discretion—for example, in pardoning, prosecuting, and sentencing. To argue, as plaintiffs do, that the very existence of such latitude offends the Federal Constitution is to suggest a fantastic judicial power to stop the States from governing. Cf. e. g., Oyler v. Boles, 368 U.S. 448, 454–456, 82 S.Ct. 501, 7 L. Ed.2d 446 (1962); Williams v. People of State of New York, 337 U.S. 241, 69 S.Ct. 1079, 93 L.Ed. 1337 (1949); Moog Industries, Inc. v. F. T. C., 355 U.S. 411, 413, 78 S.Ct. 377, 2 L.Ed.2d 370 (1958); Gross v. Bishop, 377 F.2d 492, 494 (8th Cir. 1967); Moss v. Hornig, 314 F.2d 89 (2d Cir. 1963); United States v. Shaughnessy, 180 F.2d 489, 491 (2d Cir.) 1950).[22]

This is not to say, of course, that the power to mitigate the law's literal exactions is beyond constitutional scrutiny. Arbitrary or invidious *application* in any area may transgress the bounds of fundamental fairness and equality set by the Fourteenth Amendment. Cf., e. g., U. S. ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 268, 74 S.Ct. 499, 98 L.Ed. 681 (1954); Continental Baking Co. v. Woodring, 286 U.S. 352, 367–368, 52 S.Ct. 595, 76 L.Ed. 1155 (1932); Corporation Commission v. Lowe, 281 U.S. 431, 438, 50 S.Ct. 397, 74 L.Ed. 945 (1930); Yick Wo v. Hopkins, 118 U.S. 356, 366, 6 S.Ct. 1064, 30 L.Ed. 220 (1886); Gross v. Bishop, supra, 377 F.2d at 495. But there is no showing by plaintiffs of

---

**20.** Cf. State v. Griffiths, 152 Conn. 48, 57, 203 A.2d 144, 149 (1964), upholding discretion of welfare commissioner to determine financial ability of certain relatives to contribute support. The Court found adequate standards woven through the rest of the chapter relating to AFDC.

**21.** We do not suggest, obviously, that such an unqualified directive would be the only possible alternative to the grant of discretionary power as it stands. It would be, however, a permissible alternative under the view we take of the state legislative power.

**22.** Compare with the provisions here in question Section 204 of the Social Security Act, 49 Stat. 624, as amended January 2, 1968, 81 Stat. 861, 42 U.S.C. § 404, which provides for recovery of overpayments and states in subsection (b): "In any case in which more than the *correct amount of payment* has been made, there shall be no adjustment of payments to, or recovery by the United States from, any person who is without fault if such adjustment or recovery would defeat the purpose of this title or would be against equity and good conscience."

capriciousness or irrational discrimination in the application of the recovery provisions, either generally or, more importantly, to plaintiffs themselves.) Urging that the statutes be erased sweepingly on their face, plaintiffs ignore the fact that the discretion conferred upon administrators is subject to test and check both in administrative "fair hearings," N. Y. Social Services Law §§ 304(4) (APTD) and 353(2) (AFDC), and on judicial review under N.Y. CPLR Article 78. Cf. Laackman v. McManus, 43 Misc.2d 382, 251 N.Y.S. 2d 191 (Sup.Ct.1964); Greenwood v. Taylor, 270 App.Div. 849, 60 N.Y.S.2d 452, rearg. denied, 270 App.Div. 1024, 63 N.Y.S.2d 216 (1946). And see Bourjois Inc. v. Chapman, 301 U.S. 183, 189, 57 S.Ct. 691, 81 L.Ed. 1027 (1937); American Power & Light Co. v. S. E. C., 329 U.S. 90, 105, 67 S.Ct. 133, 91 L.Ed. 103 (1946).

■ Plaintiffs are wrong in believing that this is a case appropriate for holding statutes invalid on their face. This is not a situation, like that most familiarly encountered under the First Amendment, where the very existence of the enactment serves to "chill" or otherwise impair the exercise of protected freedoms. E. g., Thornhill v. State of Alabama, 310 U.S. 88, 98, 60 S.Ct. 736, 84 L.Ed. 1093 (1940); NAACP v. Button, 371 U.S. 415, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). In other contexts, even where criminal liability is in issue, the adequacy of the statutory message is normally to be appraised "not only in terms of the statute 'on its face' but also in the light of the conduct to which it is applied." United States v. National Dairy Products Corp., 372 U.S. 29, 36, 83 S.Ct. 594, 600, 9 L.Ed. 2d 561 (1963). That restraining principle applies *a fortiori* to the statutes here in question.

### Equal Protection

Considerations similar to those just canvassed apply to this branch of plaintiffs' argument.

Plaintiffs list several "discriminations" which result, in their view, in a denial of equal protection:

(1) That the State supplies many benefits for which it does not seek repayment—Medicaid, public education, free milk, museums, etc.

(2) That the State discriminates between those who have property and those who do not.

(3) That the State makes arbitrary and indefensible distinctions when it puts liens on personal injury claims but exempts from such burdens workmen's compensation awards and benefits paid under the Volunteer Firemen's Benefit Law, McKinney's Consol.Laws, c. 64–a.

There is no "logic" in such distinctions, plaintiffs say. But neither the inapposite appeal to "logic" nor any ground of constitutional law supports their view.

■ Like the life of the law generally, the Fourteenth Amendment was not designed as an exercise in logic. It is ancient learning by now that a classification meets the equal protection test "if it is practical, and is not reviewable unless palpably arbitrary." Orient Insurance Co. v. Daggs, 172 U.S. 557, 562, 19 S.Ct. 281, 282, 43 L.Ed. 552 (1869). If the classification has "some reasonable basis," it cannot be held offensive to the Equal Protection Clause "because it is not made with mathematical nicety or because in practice it results in some inequality." Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). "The problems of government are practical ones and may justify, if they do not require, rough accommodations,—illogical, it may be, and unscientific." Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913).

Measured against such familiar teachings, plaintiffs' arguments verge upon

(or reach) the frivolous.[23] It will be sufficient to discuss briefly their relatively plausible contention that the exemptions for workmen's compensation and volunteer firemen's awards render invalid the lien upon personal injury claims.

The special concerns which led to singling out the groups benefited by workmen's compensation laws are too well known by now to warrant restatement here. In a way, plaintiffs' views on this subject are reminiscent of unsuccessful arguments in another era that the laws were invalid because they excluded from coverage some classes of working people. E. g., Middleton v. Texas Power & Light Co., 249 U.S. 152, 157–160, 39 S.Ct. 227, 63 L.Ed. 527 (1919); New York Central R. R. v. White, 243 U.S. 188, 208, 37 S.Ct. 247, 61 L.Ed. 667 (1917). However that may be, there are characteristic features of New York's Workmen's Compensation Law, McKinney's Consol. Laws, c. 67, which further the refutation of plaintiffs' position. Section 33 of that Law exempts benefits "from levy, execution and attachment or other remedy for recovery or collection of a debt." There is no comparable general exemption for personal injury recoveries. Workmen's compensation benefits are generally given in small, periodic payments under schedules which exclude the kinds of uncertain and potentially substantial recoveries in personal injury suits for pain and suffering. )

Equally pertinent details bear mention, without being essential, on the subject of benefits for volunteer firemen. The statutes providing such benefits declare and assume a public debt to volunteer firemen for "service which [they] render to others without remuneration." N. Y. Volunteer Firemen's Benefit Law § 2.

In this way, the State undertakes both to encourage service of this kind and to recognize a "moral obligation" upon the community to compensate at least for injury or death incurred in the line of such duty. See Bauman v. Town of Irondequoit, 204 Misc. 494, 500, 122 N.Y.S.2d 47, 52, aff'd, 282 App.Div. 916, 125 N.Y.S.2d 250 (1953), aff'd 307 N.Y. 926, 123 N.E.2d 574 (1954).

The exemptions plaintiffs attack do not approach the kind of caprice which could generate serious doubts under the Equal Protection Clause. We agree with and follow the views of Justice Schaefer, rejecting for a unanimous Court essentially the same arguments under an essentially similar statutory scheme. Donoho v. O'Connell's, Inc., 18 Ill.2d 432, 164 N.E.2d 52, 55–56 (1960):

"It is true that the statute does not provide comprehensively for a lien upon all potential assets that might be or become available to a recipient. But the validity of legislation does not depend upon complete comprehensiveness, nor does the constitution require that it conform to an ideal pattern of orderliness. It is enough if the selection of subjects for inclusion and exclusion rests upon a rational basis. * * * We think that such a basis exists here.

"The Workmen's Compensation Act, the Workmen's Occupational Diseases Act and the Wrongful Death Act fix maximum limits of recovery, regardless of the extent of the actual loss that was sustained. Payments under the Workmen's Compensation and Occupational Diseases acts are ordinarily made periodically and liens upon those payments are forbidden. Ill.Rev.Stat. 1959, chap. 48, pars. 138.21, 172.56. * * * The limited recoveries under these statutes do not include an allowance for pain and suffering, an ele-

---

23. The characterization seems fully merited when plaintiffs arrive at their denunciation of the distinction between people who do and people who do not have money or other property. It would be difficult to conceive of a more pertinent criterion for welfare assistance unless or until someone urges (as plaintiffs do not appear to be urging) that a "means test," whatever issues of policy it may raise, must be outlawed under the Constitution.

ment of damage which looms large in personal injury cases. It is common knowledge that the amounts recovered under these statutes are far smaller than amounts recovered in common-law actions. These are genuine differences of situation, which will support legislative classification. Furthermore, the small amount of the periodic payments under the Workmen's Compensation and Occupational Diseases acts might make collection a difficult and expensive task, and the legislature could properly act upon this practical consideration."

See to similar effect the cases cited at the end of "II," supra.

A few words should be added to deal with plaintiffs' reliance upon recent decisions which have struck down statutes requiring a prior period of state residence as a condition of eligibility for welfare assistance, Thompson v. Shapiro, 270 F.Supp. 331 (D.Conn.1967); Green v. Department of Public Welfare, 270 F. Supp. 173 (D.Del.1967); Smith v. Reynolds, 277 F.Supp. 65 (E.D.Pa.1967),[24] and upon a decision invalidating a state regulation which made the immoral conduct of the mother grounds for denying AFDC assistance to her children, Smith v. King, 277 F.Supp. 31 (M.D.Ala.1967). We do not presume to question any of these cases, the results of which are scheduled for early examination by the Supreme Court.[25] It is enough to say that they are clearly distinguishable from this one. Residence requirements, resulting in denials of aid, as compared with grants conditioned upon obligations to repay, touch an always delicate subject

of discrimination favoring state residents over non-residents. They have been thought, moreover, by the courts finding invalidity, to trench upon a specifically defined constitutional freedom, the right of interstate travel as it was specifically enforced in Edwards v. People of State of California, 314 U.S. 160, 62 S.Ct. 164, 86 L.Ed. 119 (1941). The differences from the situation before us are patent. Similarly far removed is the problem presented by secular commandments that would visit upon children the sins of their parents.

### The Supremacy Clause

The Social Security Act contains among its provisions for aid to families with dependent children the statement of a federal purpose to enable recipients of assistance "to attain or retain capability for * * * maximum self-support and personal independence * * *." 42 U.S.C. § 601. Similar language appears in the titles relating to assistance for the blind and disabled. 42 U.S.C. §§ 1201, 1351. Plaintiffs say the New York recovery provisions are in irreconcilable conflict with these federal statutes. The argument lacks merit.

As noted already, New York specifically exempts wages and salaries from the repayment obligation. The statutes plaintiffs attack reach only to property already owned or to acquisitions which have more or less the character of "windfalls"—at least in the sense that such acquisitions do not result from purposeful efforts to "attain or retain capability for self-support or self-care." 42 U.S.C. § 1351.

---

24. Compare Harrell v. Board of Commissioners of District of Columbia, 269 F. Supp. 919 (D.D.C.1967), denying an application for the convening of a three-judge court to determine the constitutionality of the Washington, D. C. residency requirement for welfare recipients. After reversal of that initial ruling in a mandamus proceeding, a divided three-judge court sustained the constitutional attack. Harrell v. Tobriner, D.C., 279 F.Supp. 22 (Nov. 8, 1967), probable jurisdiction noted sub nom. Washington v. Harrell, 390 U.S. 940, 88 S.Ct. 1053, 19 L.Ed.2d 1129 (March 4, 1968).

25. Probable jurisdiction has been noted in the cases of Thompson v. Shapiro, 389 U.S. 1032, 88 S.Ct. 784, 19 L.Ed.2d 820 (Jan. 15, 1968) and King v. Smith, 390 U.S. 903, 88 S.Ct. 821, 19 L.Ed. 2d 869 (Jan. 22, 1968) and Smith v. Reynolds, 390 U.S. 940, 88 S.Ct. 1054, 19 L.Ed.2d 1129 (March 5, 1968).

This alone would appear to refute plaintiffs' claim of inconsistency.[26] At any rate, this is certainly not a case where "the repugnance or conflict is so 'direct and positive' that the two acts cannot 'be reconciled or consistently stand together.'" Kelly v. Washington, ex. rel Foss Co., 302 U.S. 1, 10, 58 S.Ct. 87, 92, 82 L.Ed. 3 (1937). And although it is true that " [l]ocal regulations which would pass muster under the Due Process Clause might nonetheless fail to survive other challenges to constitutionality that bring the Supremacy Clause into play," Bibb v. Navajo Freight Lines, 359 U.S. 520, 529, 79 S.Ct. 962, 967, 3 L.Ed.2d 1003 (1959), "unless the state law, in terms or in its practical administration, conflicts with the Act of Congress, or plainly and palpably infringes its policy," Southern Pacific Co. v. State of Arizona, ex rel. Sullivan, 325 U.S. 761, 766, 65 S. Ct. 1515, 1518, 89 L.Ed. 1915 (1945), the Supremacy Clause is not violated.

There are other, perhaps more decisive answers to plaintiffs' theory. The federal statutes say nothing about repayment, except to recognize and make provision for at least some forms of recovery from people who have received assistance. In providing for computation of grants to the States, the Social Security Act declares that each State's periodic grant is to be "reduced by a sum equivalent to the pro rata share to which the United States is equitably entitled, as determined by the Secretary of Health, Education, and Welfare, of the net amount recovered during any prior quarter by the State * * *." 42 U.S.C. § 603(b) (2) (AFDC), § 1353(b) (2) (APTD). If these provisions do not positively *authorize*, they certainly accommodate hospitably, the repayment obligations plaintiffs assail.

Plaintiffs cite committee reports referring to the originals of the foregoing statutes where it was observed that the States might be collecting back from recipients (or their estates) and that such recoveries might happen, "for example, because those persons had been defrauding the State * * *." H. R. Rep.No. 65, 74th Cong., 1st Sess. 17 (1935); S.Rep. No. 628, 74th Cong., 1st Sess. 29 (1935). From these items of legislative history, plaintiffs reason that (a) the "example" of recoveries for fraud was meant to be exhaustive and (b) the implication is to forbid any other kind of recoveries. The reasoning is heady but unpersuasive.

Concluding the thin subject of plaintiffs' Supremacy argument, we recall the wide prevalence among the States of statutes like those in question; the duty of HEW's Secretary to disapprove, and withhold federal funds from, unlawful state programs, 42 U.S.C. §§ 304, 604, 1204, 1354; cf. Smith v. King, 277 F. Supp. 31, (M.D.Ala.1967); and the apparent acquiescence of Congress (including steady appropriations) over the years in state arrangements which are so common that they must be deemed to be known at least to the responsible and interested Committees of the Congress. There is authoritative weight both in the practical administrative construction by those responsible for the federal programs, United States v. Republic Steel Corp., 362 U.S. 482, 490 n. 5, 80 S.Ct. 884, 4 L.Ed.2d 903 (1960); F. T. C. v. Mandel Brothers, 359 U.S. 385, 391, 3 L.Ed.2d 893 (1959); F. H. A. v. Darlington, Inc., 358 U.S. 84, 89–90, 79 S.Ct. 141, 3 L.Ed.2d 132 (1958); McLaren v. Fleischer, 256 U.S. 477, 481, 41 S.Ct. 577, 65 L.Ed. 1052 (1921), and the seeming acceptance (and support) by the Congress itself of the measures plaintiffs denounce, e. g., cf. Ivanhoe Irriq. Dist. v. McCracken, 357 U.S. 275, 293, 78 S.Ct. 1174, 2 L.Ed.2d 1313 (1958); Fleming v. Mohawk Wrecking & Lumber Co., 331 U.S. 111, 116, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947); Brooks v. Dewar, 313 U.S. 354, 360, 61 S.Ct. 979, 85 L.Ed. 1399

---

**26.** This is not to suggest that the State could not reach earnings. It is merely to say that the case is easier because the State does not undertake to do so.

(1941); Alaska Steamship Co. v. United States, 290 U.S. 256, 262, 54 S.Ct. 159, 78 L.Ed. 302 (1933). Against arguments as tenuous as the ones plaintiffs marshal, such considerations alone would be sufficient to sustain the state legislation.

We conclude, in sum, that the complaint is without merit. Judgment will be entered ordering its dismissal.[27]
It is so ordered.

## DISSENTING OPINION

IRVING R. KAUFMAN, Circuit Judge:

I do not dispute several commonplace principles set forth in the majority opinion. For example, I agree that the State of New York has the primary responsibility to develop standards for the distribution of the resources allocated to public assistance programs in which it has elected to participate. I agree also that the state may legitimately attempt to conserve resources by imposing some obligation to repay on persons who receive assistance. Nor do I take issue with the well established precept that federal courts sitting in constitutional judgment of state statutes should be guided by counsels of self-restraint so that "ill starred adventures of the judiciary [do not] jeopardize its essential usefulness." R. Jackson, The Struggle for Judicial Supremacy 321 (1941). My point of difference with the majority

turns on whether the means adopted by the State of New York[1] economically and effectively to further the objectives of public assistance deprive these recipients of the liberty and equality secured to them by the Fourteenth Amendment.

Where the state regulates or interferes with fundamental aspects of freedom, "precision of regulation must be the touchstone." Griswold v. State of Connecticut, 381 U.S. 479, 498, 85 S.Ct. 1678, 1689, 14 L.Ed.2d 510 (1965), quoting NAACP v. Button, 371 U.S. 415, 438, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). If a statute or regulation impinges on critical personal interests, we are required to subject it to closer scrutiny, and to search with care for adequate justification. We must ascertain, therefore, whether the restriction is reasonably related to the public interest the legislature sought to secure, and if it could have been as effectively secured with less abrasive impact on the personal right involved. Because I believe the scheme designed by New York does not withstand the requisite inquiry, I disagree with my brothers. I hasten to add that I do not dissent because I believe that it is beyond the power of the state to devise a rational recovery provision. Instead, I am of the view that by reason of the seriousness of the personal interest involved, the inelegance of the scheme designed, the ease of correcting it by more discriminating methods, and the

27. In their complaint plaintiffs asserted their cause as a class action. We have had no submissions from either side on the questions to be considered under Fed.R.Civ.P. 23 before determining whether the suit is properly maintainable as one on behalf of a class. On the small record as it stands, there is uncertainty whether plaintiffs may be deemed adequate representatives of anyone but themselves. Cf. Hansberry v. Lee, 311 U.S. 32, 61 S.Ct. 115, 85 L.Ed. 22 (1940); Fed.R.Civ.P. 23(a). In the circumstances, since the complaint is being dismissed, there is no substantial reason why we should purport to "bind" others, apart from any temporary or permanent effect this decision may have as *stare decisis*. Accordingly, it is recorded that no sufficient

grounds have been shown for deeming this a class suit and that the judgment of dismissal will "include" (in the language of Rule 23) only the named parties.

1. The plaintiffs before us received public assistance under programs administered by the Commissioner of Social Services in New York City and we are thus presented with statutes as applied in New York City. The policy of exempting savings derived from accumulated income, quoted by Judge Frankel at note 12 supra, is a directive issued by the Commissioner of Social Services for the City of New York. The defendant State Commissioner, however, has stated that the policy exempting earnings is statewide.

insubstantiality of the interest served, the State of New York has not acted with adequate precision. ⟩ Where substantial challenge is made to state regulations impinging upon increasingly important yet largely overlooked aspects of personal liberty, I believe the federal courts are obligated to do more than dismiss the complaint with facile reference to judicial attitudes toward state attempts to regulate business interests in order to foster personal dignity.

The recovery obligation as enforced by New York City fails to meet the test of minimal rationality. (It does not distinguish between true and substantial windfalls that are unrelated to the capacity to retain self-support and property acquired by purposeful effort that is essential to maintain whatever level of independence the welfare recipient has achieved. The policy of exempting accumulated income from attachment is concededly designed to meet this required distinction. I would hold, however, that the state is constitutionally required to go further and to exempt a modest interest in real property or insurance and at least some part of damages recovered for personal injury. It may be true that the Constitution does not impose an affirmative obligation · on the state to create the circumstances in which people will become independent and self-supporting. But I do suggest that it does prohibit the State from placing obstacles in the path of efforts to become independent of welfare bounty or to maintain the independence already achieved.) The social benefit of public assistance would come to naught if this were not so.

If the property a welfare recipient is able to acquire by legitimate means is subject to attachment without regard to amount, the state thus fails to afford proper scope to one's right to be an independent individual, not compelled to rely on government for the right to exist. The requisite precision and discrimination is not unattainable. It may be achieved by a fixed dollar value exemption, or, with respect to real estate, by an outright exemption for property used as a residence.[2] And, while we should not concern ourselves with the precise terms of a valid regulatory scheme, we cannot ignore significant imperfections engendered by an indiscriminate obligation to repay the costs of public assistance. To require precision is not, as it is suggested, to demand that the State equalize the economic condition of its citizens. It simply serves to restrain the State from unnecessarily and arbitrarily hindering the personal strivings and ambitions of individuals to escape the inhibiting embrace of poverty.

Under the recovery provisions, Geraldine Snell's $900 interest in a cooperative apartment has been assigned to the Department of Social Services; Miriam Ramos, Juan Malave and Robert Whaley have been obligated to repay the full cost of public assistance from potential recoveries for injuries sustained in accidents; and Helen Marley, who was dependent on public assistance during a serious illness from 1945 to 1954, is unable to obtain the proceeds of a small insurance policy because of a prior assignment to the Department.

It seems to me beyond question that we are dealing here with a facet of liberty. The federal purpose in providing aid to dependent children is, it is agreed, in-

---

2. California, with seventeen other states, imposes no obligation to repay on welfare recipients. In computing eligibility, the California statute indicates the form of exemption that might also be applied to recovery. Thus Section 11261, Ann.Calif.Code, "Welfare and Institutions" does not permit consideration of personal property "directly connected with efforts to become self-supporting."

Section 11255 permits AFDC recipients to own realty valued at no more than $5,000. Section 11152 permits a blind, disabled or aged recipient to retain realty, of any value, "if it provides [him] with a home." Section 11154 permits a reserve "for future contingencies" of $2,000 for a married couple on Old Age Assistance, Aid to the Disabled, or Aid to the Blind programs.

tended to afford recipients the opportunity to "attain or retain capability for * * * self-support and personal independence * * *." 42 U.S.C. § 601. The freedom to achieve "self-support and personal independence" is within the compass of "liberty" secured by the Fourteenth Amendment against undue restraint. The word "liberty" cannot be defined with precision; it "is not a series of isolated points pricked out '* * * [but] a rational continuum," Poe v. Ullman, 367 U.S. 497, 543, 81 S.Ct. 1752, 1776, 6 L.Ed.2d 989 (1961) (Harlan, J., dissenting); Meyer v. State of Nebraska, 262 U.S. 390, 399, 43 S.Ct. 625, 67 L.Ed. 1042 (1923). Liberty is not "confined to mere freedom from bodily restraint * * * [but] extends to the full range of conduct which the individual is free to pursue" Bolling v. Sharpe, 347 U.S. 497, 74 S.Ct. 693, 98 L.Ed. 884 (1954).

While the precise contours and boundaries of the term may be vague, its reach is determined from the traditions and history of the land. No principle has firmer roots in that tradition than that the security of meager property interests is an aspect of self-care;- that the goals of participatory democracy are furthered by an independent and secure citizenry.[3] We err if this tradition is forgotten. See generally Philbrick, Changing Conceptions of Property in Law, 86 U.Pa.L. Rev. 691 (1938); Reich, The New Property, 73 Yale L.J. 733, 771–774 (1964). It is still true today that "the only dependable foundation of personal liberty is the economic security of private property." W. Lippmann, The Method of Freedom 101 (1934). And Professor Reich has noted that "more than ever the individual needs to possess, in whatever form, a small but sovereign island of his own." Reich, The New Property, 73 Yale L.J. at 774.

The majority carefully reminds us that the purpose of the Bill of Rights was "to take government off the backs of people." Supra, p. 863, quoting Schneider v. Smith, 390 U.S. 17, 88 S.Ct. 682, 19 L. Ed.2d 799 (1968). But it is just that purpose that commands us to require care and precision from the state when it deals with "matters of human decency and welfare" (supra p. 863)—when the net effect may well be appreciably or unnecessarily to increase the burden on the individual. "Paradoxical though it may seem, the most serious threat to freedom in our programs of public service and public benefits is to the freedom of the recipient. * * * It behooves us to be constantly on our guard lest, out of zeal to better people's lot, we impose on them patterns of behavior in matters in which, under our scheme of things, government ought not to meddle." Willcox, Patterns of Social Legislation Reflections on the Welfare State, 6 J. of Pub. L. 3, 7 (1957).

My brothers also seem to detect a distinction in the New York scheme between acquisitions "which have more or less the character of windfalls" and property acquired by "purposeful efforts to 'attain or retain capability for self-support or self-care'." Whatever the constitutional propriety of this distinction, I cannot see that the statutes before us draw any such line. Nor can I understand how the majority can apply its assumed distinction since we do not know whether Geraldine Snell's apartment interest or Helen Marley's insurance policy were bought solely with "income from employment" or not. Surely the Department was not concerned with the source of the recipients' assets when it protected its claim by prior assignment. I see no reason, therefore, why the burden of raising the issue should be placed on welfare recipients. If a welfare recipient begins work, extricates himself from welfare, and accumulates $500 or $1000 in income, as I understand the recovery provisions ap-

---

3. Chapter 29 of Magna Carta declared that "No freeman shall be taken or imprisoned or *disseised of his free tenement,* liberties, or free customs * * * unless by the law of the land." In The Federalist No. 10 James Madison recognized, as John Locke had before him, the connection between liberty and property. The Federalist 52–54 (H. C. Lodge ed. 1888).

plied in New York City, his obligation to repay will depend on whether his savings are invested in real property (or insurance), or placed in a bank account. In the first illustration, the realty is attached, in the latter the bank account is secure—at least until another Welfare Commissioner determines otherwise. That is not a distinction based on the statutory purpose to encourage independence; and it is not a distinction with rational justification in terms of the state's interest in minimizing public expenditures.

It cannot be argued that the statutes distinguish between property acquired after the period of assistance and that accumulated while on the rolls. Snell had her apartment before receiving aid, and she was obliged to assign it as a condition to participation in the program.[4] In any event, the obligation to repay would attach as firmly if she acquired the property within 10 years after receiving aid. Also, it appears that some premiums on Marley's policy were paid after a long illness with cancer and she was no longer receiving public aid, yet the full proceeds are subject to the lien and beyond her dominion.

Plaintiffs Ramos and Whaley have pending claims for personal injury damages arising out of accidents. Each has assigned the potential recoveries to the Department of Social Services to repay the cost of assistance. Plaintiff Malave actually received $400 from the Housing Authority as compensation for injuries, and the welfare officials have filed a "notice of lien" against these funds. The law provides all persons access to the courts in order that they might seek compensation for injuries caused by another. It is surely inadequate to restore a full measure of comfort to the victims of negligent behavior but it is nevertheless the best means yet devised; Whaley's limb is exchanged for cash, and Ramos' unspecified damage is "corrected" with money—the law can do no more. The money transferred will serve many purposes—not only does it pay for medical care but it replaces income that might have been earned but for the disability and, however crudely, it alleviates suffering by offering material aid. This inept and inexact exchange is described as "making whole". The majority tells us that the Constitution "gives us no authority to follow the figurative trails of metaphors like this." (14) We might not like the trail but it represents a process with clear purposes, and once the design is laid bare it surpasses credulity to deny our authority to examine the relationship of technique to objective.

My brothers would have us believe that for purposes of constitutional inquiry there is little difference between denying eligibility for assistance to one with substantial assets in hand derived from a tort claim, and recovering assistance from a former welfare recipient who succeeds in receiving compensation for injuries. In the first case, however, the victim has the means of immediate subsistence—a test of eligibility; if the recovery had been $500 instead of $500,000 he might still be eligible for aid. In the second, the attachment of a meager recovery can effectively destroy the means for future subsistence independence as well as remove the financial comfort given as compensation for physical pain. As a result, self-sufficiency may be jeopardized, and return to relief hastened.

I have more regard than the majority for the contentions made to us by the plaintiffs, supported by their experts,

---

4. It should be noted that there is no question here of concealment of assets or fraud. The plaintiffs met the standards of eligibility during the period they received assistance, and their objection is to the obligation imposed to repay costs of assistance after they regain self-sufficiency. The Department of Social Services need not show any fraud or concealment to exercise its right of recovery. See Hodson v. Bloise, 173 Misc. 69, 16 N.Y.S.2d 49 (1939); In re Beaman's Estate, 171 Misc. 578, 13 N.Y. S.2d 188 (1939).

and not refuted by Commissioners Ginsberg and Wyman. ⟨The plaintiffs suggest that ownership of a home or insurance policy represents a symbol of independence among the poor, that the protective assignments generate resentment and frustrate social purposes of rehabilitation, and that the obligation to repay, with which we are concerned, exerts a deterrent influence that is partly responsible for the fact that one in two eligibles fails to apply for public assistance.⟩ These assertions of the potential detrimental effects of recovery are consistent with the experience and comments of welfare specialists, and the arguments accord with common understanding.[5]

In sum, while I do not question the power of the State through appropriate regulation to recover public assistance expenditures, I would declare the statutory scheme with which we are presented in violation of the Fourteenth Amendment. The proper objective of conserving resources can be achieved by a more discriminating pattern. It is but a modest burden to impose if we require that the Department of Social Services tailor its regulations so that the guide is not the *mere availability of some property* but a genuine *ability to repay* without sacrificing the basic incidents of self-support. Such a course of decision would better serve our responsibility to secure individual liberty against purposeless restraint. At the same time, it in no way compromises Justice Brandeis' suggestion that "one of the happy incidents of the federal system [is] that a single courageous state may, if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." New State Ice Co. v. Liebmann, 285 U.S. 262, 311, 52 S.Ct. 371, 386, 76 L.Ed. 747 (1932) (dissenting). Especially where the infirmity may be remedied without new legislation, our mandate to demand more precision from regulations that constrain liberty will challenge the ingenuity and inventive spirit of the states while ensuring fuller freedom for all the people.

5. See generally, Cahn & Cahn, The War on Poverty: A Civilian Perspective, 73 Yale L.J. 1317 (1964); tenBroek & Wilson, Public Assistance and Social Insurance—A Normative Approach, 1 U.C.L.A. L.Rev. 237 (1954); Reich, Individual Rights and Social Welfare: The Emerging Legal Issues, 74 Yale L.J. 1245 (1965); Wickenden & Bell, Public Welfare—Time for A Change (1961); Wickenden, Memorandum: Poverty and the Law, The Constitutional Rights of Assistance Recipients, March 25, 1965; Moynihan, The Crisis in Welfare, The Public Interest, p. 3 (Winter, 1968); Advisory Council on Public Welfare, Report to the Secretary of Health, Education and Welfare (June, 1966).

We might indicate additional potential dangers adverted to by the expert witnesses. The provisions as constituted add another influence that promotes family instability, since potential husbands are discouraged from entering a family and risking an action against their property. Although the purported justification for the recovery obligation is one of economy, the net effect may be to increase the burden on the state by preventing former recipients from maintaining a position of self-support. The obligation to hand over tort recoveries to the state inhibits the recipient from bringing claims under the law that are freely pursued by non-recipients. Dr. Charles Grosser, a noted expert in Social Services, tells us that these provisions operate in effect to leave recipients in continuous need of assistance, unable to get off the lists for long, because they are unable to retain a measure of self-support.