The **HILL CONSTRUCTION COM-
PANY** et al.

v.

**STATE OF CONNECTICUT** et al.

Civ. No. B–655.

United States District Court,
D. Connecticut.

Oct. 30, 1973.

William M. Ivler, Stamford, Conn., for plaintiffs.

Robert K. Killian, Atty. Gen., F. Michael Ahern, and Bernard F. McGovern, Jr., Asst. Attys. Gen., Hartford, Conn., James F. Bingham, and Julian K. Melmed, Stamford, Conn., for defendants.

Before SMITH, Circuit Judge, and BLUMENFELD and CLARIE, District Judges.

MEMORANDUM OF DECISION

BLUMENFELD, District Judge:

In this action plaintiffs challenge the constitutionality of Conn.Gen.Stats. § 19–347r, and § 18–25 of Article IV, Ordinance 246 Supplemental of the City of Stamford, which pertain to the regulation of rental housing. Plaintiffs seek declaratory and injunctive relief, 28 U. S.C. §§ 2201 et seq., and jurisdiction is claimed under 28 U.S.C. §§ 1331, 1343(3). Plaintiffs are owners of certain apartment houses located in the City of Stamford. Defendants are the State and City which seek to enforce the challenged statute and ordinance and the Director of Health of the City of Stamford, who is charged with implementing the challenged provision of the Stamford ordinance.

Connecticut General Statutes § 19-347r is an enabling statute [1] pursuant to which the City of Stamford enacted Ordinance 246 Supplemental, which became effective on January 1, 1973. The provision of the Ordinance which is here challenged, § 18–25 of Article IV, establishes a procedure whereby landlords must obtain a Certificate of Apartment Occupancy (hereinafter "CAO") from the Director of Health before renting any apartment in an apartment house containing four or more dwelling units.[2] If the landlord fails to obtain a CAO prior to rental, the tenant may assert such failure as a defense to an action for rent. The requirements of § 18–25 do not apply to apartment houses less than fifteen years old or to those owned by a Housing Authority organized under the provisions of Conn.Gen.Stats. Chapter 128.

1. Section 19–347r of the General Statutes of Connecticut, as amended, provides in full:

(a) No apartment in any apartment house containing four or more housing units in any municipality which adopts the provisions of this section by vote of its legislative body shall be occupied for human habitation, after a vacancy, until a certificate of occupancy has been issued by the person designated by such legislative body of such municipality to administer the provisions of this section, certifying that such apartment conforms to the requirements of the applicable housing ordinances of such municipality and this chapter; provided no provision of this section shall be construed to prohibit human occupancy of such apartment during the pendency of an application for such certificate. Any person aggrieved by the refusal of a certificate of occupancy may appeal to the court of common pleas for the county within which the apartment house is located, and such appeal shall be privileged.

(b) No rent shall be recoverable by the owner or lessor of such apartment house for the occupation of any apartment for which a certificate of occupancy has not been obtained prior to the rental thereof in violation of subsection (a) of this section.

(c) The provisions of this section shall not apply to any apartment house which has been constructed or substantially reconstructed within a period of fifteen years next preceding the date such certificate of occupancy would otherwise be required hereunder nor to any apartment house owned by a housing authority organized under the provisions of chapter 128, which has been constructed or altered pursuant to a contract with the federal government or the state providing for annual contributions or other financial assistance.

2. Section 18–25 of Article IV, Ordinance 246 Supplemental provides:

(a) No owner or other person shall occupy or let to another person, any vacant dwelling or dwelling unit, or rooming unit or hotel unit, unless it and the premises are clean, sanitary, fit for human occupancy and comply with all applicable legal requirements of the State of Connecticut and the City of Stamford.

(b) No apartment in any apartment house containing four or more dwelling units shall be occupied for human habitation, after a vacancy, until a Certificate of Apartment Occupancy has been issued by the Director of Health or his authorized representative, certifying that such apartment conforms to the requirements of Chapter 18 of the Stamford City Code and Chapter 352 of the General Statutes of Connecticut; provided, no provision of this ordinance shall be construed to prohibit human occupancy of such apartment during the pendency of an application for such certificate. Any person aggrieved by the refusal of a Certificate of Apartment Occupancy, may appeal to the Court of Common Pleas for Fairfield County, and such appeal shall be privileged.

(c) No rent shall be recoverable by the owner or lessor of such apartment house for the occupation of any apartment for which a Certificate of Apartment Occupancy has not been obtained prior to the rental thereof in violation of Section 18–25(b) of this ordinance.

(d) The provisions of Section 18–25(b) and (c) shall not apply to any apartment house which has [been] constructed or substantially reconstructed within a period of fifteen years next preceding the date of such Certificate of Apartment Occupancy would otherwise be required hereunder, [nor] to any apartment house owned by a Housing Authority organized under the provisions of Connecticut General Statutes Chapter 128 which has been constructed or altered pursuant to a contract with the Federal Government or the State of Connecticut, providing for annual contribution or other financial assistance.

Plaintiffs attack the Ordinance (and through it, the Statute) on two grounds.[3] First, they claim that its application only to those buildings containing four or more dwelling units, more than fifteen years old, and not owned by a Housing Authority, is arbitrary and capricious, thereby denying plaintiffs the equal protection of the laws. Second, they claim that the ordinance fails to provide a constitutionally adequate procedure whereby CAO's are to be granted or denied. They specifically point to the facts that no particular procedure is established in the ordinance for the actual issuance of the CAO's and that no time limit is set by which the Director of Health must issue or deny the CAO. In consequence, plaintiffs contend, they may be deprived of property without due process of law. They assert that a landlord who obtains the CAO even one day after the tenant moves in, whether through his own negligence or due to tardiness on the part of the Director of Health, will be unable to recover rent for the balance of the tenancy.

## I. ABSTENTION

The claim most heavily stressed by the plaintiffs goes to the specific construction which it fears may be given the Statute and Ordinance. Yet neither the statute nor the ordinance has received judicial construction, nor is there reason to believe that an attempt at a state court construction would be futile. The case may thus be within the doctrine of abstention noted in Lake Carriers' Asso. v. MacMullan, 406 U.S. 498, 510–511, 92 S.Ct. 1749, 1757, 32 L.Ed.2d 257 (1972):

"The paradigm case for abstention arises when the challenged state statute is susceptible of 'a construction by the state courts that would avoid or modify the [federal] constitutional question. . . .

'Where resolution of the federal constitutional question is dependent upon, or may be materially altered by, the determination of an uncertain issue of state law, abstention may be proper in order to avoid unnecessary friction in federal-state relations, interference with important state functions, tentative decisions on questions of state law, and premature constitutional adjudication. . . .' "

■ While this court might thus abstain on plaintiffs' due process challenge to the ordinance, a construction of the ordinance by the state courts would not resolve the Equal Protection question. We shall thus proceed to the merits of plaintiff's case.

## II. EQUAL PROTECTION

Plaintiffs claim that the exemption by the ordinance of apartment buildings containing less than four dwelling units, buildings less than fifteen years old, and buildings owned by Housing Authorities, is arbitrary and capricious and thus in violation of the Equal Protection Clause.

The relevant constitutional inquiry begins with the determination whether the ordinance "rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." San Antonio Independent School Dist. v. Rodriguez, 411 U.S. 1, 93 S.Ct. 1278, 36 L.Ed.2d 16, 33 (1973).[4]

---

3. Plaintiffs seek an adjudication of the constitutionality of the enabling statute and the local ordinance. Although this opinion specifically refers to the ordinance, the discussion applies with equal force to the enabling statute.

4. Until recently, equal protection claims have invoked two clearly-defined standards of review. "Under traditional equal protection principles, a State retains broad discretion to classify as long as its classification has a reasonable basis." Graham v. Richardson, 403 U.S. 365, 371, 91 S.Ct. 1848, 1852, 29 L.Ed.2d 534 (1971). Where classifications are based upon race, nationality, or alienage, however, id. at 372–373, 91 S.Ct. 1848, or

It is beyond dispute that the purpose of the ordinance and its enabling statute is the enforcement of minimum standards of maintenance and repair for rental housing, and that such purpose is "legitimate" [5] and "articulated." [6] .

■ It is equally evident that the ordinance rationally furthers such purpose. Since older buildings utilized as income-producing investments by private owners are more likely to be in need of repairs and alterations for the protection of health and safety of their tenants than are like properties of more recent construction, the ordinance is rational and not arbitrary and capricious. The application of the ordinance to privately-owned apartment buildings more than fifteen years old and containing four or more dwelling units is certainly a rea-

---

where fundamental rights are in jeopardy, e. g., Shapiro v. Thompson, 394 U.S. 618, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969), they are subjected to "strict scrutiny" and are upheld only where the state can demonstrate a "compelling state interest," id. at 638, 89 S. Ct. 1322.

This "two-tiered" approach has lately undergone strict scrutiny itself. See Doe v. Norton, 365 F.Supp. 65, p. 78, n. 22 (D. Conn.1973). In Boraas v. Village of Belle Terre, 476 F.2d 806 (2d Cir. 1973), the Second Circuit adopted the single standard of review formulated in Royster Guano Co. v. Virginia, 253 U.S. 412, 415, 40 S.Ct. 560, 64 L.Ed. 989 (1920) :

"A classification 'must be reasonable, not arbitrary, and must rest upon some ground of difference having a fair and substantial relation to the object of the legislation, so that all persons similarly circumstanced shall be treated alike.' "

As to the application of the appropriate standard, the court's conclusion in Doe, supra, 365 F.Supp. 65, pp. 78, n. 22, is equally pertinent here :

"The factual situation presented in this case warrants no grand exegesis of where the law of equal protection is headed. It will suffice to note that to the extent that the 'legitimate, articulated state purpose' referred to by Mr. Justice Powell in Rodriguez, supra, 411 U.S. 1, at 16, 93 S.Ct. 1278, at 1287, 36 L.Ed.2d at 33, and in [McGinnis v. Royster, 410 U.S. 263, 93 S. Ct. 1055, 35 L.Ed.2d 282, 289 (1973)], may be construed to establish a degree of rationality more akin to that in Boraas, supra, 476 F.2d 806, than to the 'minimum rationality' of the older standard we adopt it for use in this case."

5. The plaintiffs properly do not challenge the state's power to regulate the repair and maintenance of rental housing property.

"We deal, in other words, with what traditionally has been known as the police power. An attempt to define its reach or trace its outer limits is fruitless, for each case must turn on its own facts. The definition is essentially the product of legislative determinations addressed to the purposes of government, purposes neither abstractly nor historically capable of complete definition. Subject to specific constitutional limitations, when the legislature has spoken, the public interest has been declared in terms well-nigh conclusive. . . .

Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it. . . . Miserable and disreputable housing conditions may do more than spread disease and crime and immorality. They may also suffocate the spirit by reducing the people who live there to the status of cattle. They may indeed make living an almost insufferable burden. They may also be an ugly sore, a blight on the community which robs it of charm, which makes it a place from which men turn. The misery of housing may despoil a community as an open sewer may ruin a river." Berman v. Parker, 348 U.S. 26, 75 S.Ct. 98, 99 L.Ed. 27 (1954).

6. The statute is part of the "Tenement and Lodging Houses" chapter of the Public Health and Safety title of the Connecticut General Statutes, Conn.Gen.Stats., Title 19, Ch. 352, and was enacted following declarations that it was "landmark legislation in the struggle of the Connecticut people to assure good, safe, healthy and decent housing for our citizens." Connecticut General Assembly 1969. House of Representatives Proceedings 1969 Vol. 13, Pt. 8, p. 3670.

The ordinance was enacted to combat the situation in which

"There are, or may in the future be, dwelling structures which are so dilapidated, unsafe, dangerous, unhygienic, or unsanitary, or so faultily designed, or inadequately maintained or so improperly used as to constitute a menace to the health and safety or well-being of the occupants and the people of this City of Stamford." Ordinance No. 246 Supplemental.

sonable means of utilizing limited enforcement resources in an efficient manner and concentrating enforcement activities where they are likely to be most needed. The Equal Protection Clause requires no more. "It is no requirement of equal protection that all evils of the same genus be eradicated or none at all." Railway Express Agency, Inc. v. New York, 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949). As the Supreme Court noted recently in Jefferson v. Hackney, 406 U.S. 535, 92 S.Ct. 1724, 32 L.Ed.2d 285, 296 (1972):

" . . . in 'the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.' A legislature may address a problem 'one step at a time,' or even 'select one phase of one field and apply a remedy there, neglecting the others.' Williamson v. Lee Optical Co., 348 U.S. 483, 489 [75 S.Ct. 461, 465, 99 L.Ed. 563, 573] (1955)."

The fact that certain apartment buildings are treated differently than others is not in itself cause for complaint. As Mr. Justice Stewart noted, concurring in *Rodriguez, supra*:

"There is hardly a law on the books that does not affect some people differently from others. But the basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes. And with respect to such legislation, it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary or capricious. See, e. g., Rinaldi v. Yeager, 384 U.S. 305 [86 S.Ct. 1497, 16 L.Ed.2d 577] [footnote omitted]."

Nor can plaintiffs complain because the ordinance applies to buildings of a particular size and age. As Judge Frankel wisely stated in Snell v. Wyman, 281 F.Supp. 853, 865 (S.D.N.Y.1968), aff'd, 393 U.S. 323, 89 S.Ct. 553, 21 L.Ed.2d 511 (1969):

"Like the life of the law generally, the Fourteenth Amendment was not designed as an exercise in logic. It is ancient learning by now that a classification meets the equal protection test 'if it is practical, and is not reviewable unless palpably arbitrary.' Orient Insurance Co. v. Daggs, 172 U.S. 557, 562, 19 S.Ct. 281, 282, 43 L. Ed. 552 (1869). If the classification has 'some reasonable basis,' it cannot be held offensive to the Equal Protection Clause 'because it is not made with mathematical nicety or because in practice it results in some inequality.' Lindsley v. Natural Carbonic Gas Co., 220 U.S. 61, 78, 31 S.Ct. 337, 340, 55 L.Ed. 369 (1911). 'The problems of government are practical ones and may justify, if they do not require, rough accommodations . . . .'" Metropolis Theatre Co. v. City of Chicago, 228 U.S. 61, 69–70, 33 S.Ct. 441, 443, 57 L.Ed. 730 (1913)."

Accordingly, plaintiffs' claim that they have been denied equal protection is rejected. We turn next to their claim that the ordinance enacted by the City does not afford due process.

### III. DUE PROCESS

The Due Process Clause of the Fourteenth Amendment provides procedural safeguards for the protection of certain interests. Thus due process requires notice and a hearing before persons are deprived of certain property interests, Sniadach v. Family Finance Corp., 395 U.S. 337, 89 S.Ct. 1820, 23 L.Ed.2d 349 (1969); Fuentes v. Shevin, 407 U.S. 67, 92 S.Ct. 1983, 32 L.Ed.2d 556 (1972), and in particular circumstances where interests " 'more precious . . . than property rights' " are in issue, Stanley v. Illinois, 405 U.S. 645, 651, 92 S.Ct. 1208, 31 L.Ed.2d 551 (1972); Constantinou v. Wisconsin, 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971); Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970).

The Due Process Clause, however, does not require specific procedures every time private interests are alleged to be in jeopardy. " 'Due process' is an elusive concept. Its exact boundaries are undefinable, and its content varies according to specific factual contexts." Hannah v. Larche, 363 U.S. 420, 442, 80 S.Ct. 1502, 1514, 4 L.Ed.2d 1307 (1960). Due process "does not require a trial-type hearing in every conceivable case of government impairment of private interest. . . . The very nature of due process negates any concept of inflexible procedures universally applicable to every imaginable situation." Cafeteria & Restaurant Workers Union, Local 473, AFL–CIO v. McElroy, 367 U.S. 886, 894–895, 81 S.Ct. 1743, 1748, 6 L.Ed.2d 1230 (1961).

In any particular case, the requirements of due process will be determined by an inquiry into the "nature of the government function involved" and the "private interest that has been affected by governmental action." Id. at 895, 81 S.Ct. at 1748. In the instant case, as we have noted above, the "nature of the government function involved" is clear.

The private interest involved is plaintiffs' right to collect rent for their leased property. The difficulty for plaintiffs, however, is that it is very unclear whether such interest has been, or will be, "affected" by government action. This is not a case like Fuentes v. Shevin or Sniadach v. Family Finance Corp., supra, in which the deprivation of property was "obvious," 395 U.S. at 342, 89 S.Ct. 1820. Quite the contrary: plaintiffs can only complain of the possibility of a deprivation of property . . . and it is a possibility which may indeed be remote.

Specifically, plaintiffs fear a situation in which the landlord does not have an opportunity to apply for a CAO well in advance of occupation by the new tenant, and, as a result of delay in processing of the CAO, the CAO is not actually issued until after the tenant has taken occupancy of the premises. The example they hypothesize occurs where an apartment is vacated, and the landlord applies for a CAO, on December 31; the tenant moves in on January 1, with a one-year lease; the CAO is issued on January 2.[7] Plaintiffs fear that under a strictly literal interpretation of section (c) of the ordinance the landlord would be barred from recovering rent from the tenant, perhaps for the full term of the lease.

Thus, plaintiffs' apprehension is based on three tenuous assumptions: first, that a landlord will fail to obtain a CAO for an apartment which is not otherwise in violation of the ordinance until after the tenant has taken occupancy; second, that the tenant will refuse to pay rent, and instead assert section (c) of the ordinance as a defense to the landlord's action for rent; and third, that a state court will uphold the tenant's claim by counting the landlord's failure to obtain the CAO prior to occupancy as a per se violation of section (b) of the ordinance, thus barring any recovery by the landlord.

The evidence presented to this Court, however, indicates the remoteness of the possibility that these three events will ever actually occur. As to the first, the Director of Health testified that eighty inspections of apartments per day could be made and that CAO's could be issued within forty-eight hours of a request for a certificate. Furthermore, if there is no time or opportunity to arrange an inspection prior to actual occupancy, a landlord may obtain a temporary CAO by submitting an affidavit attesting that the premises meet the requirements of the ordinance. Similarly, if vacancy of an apartment and occupancy by a new tenant occurs during a week-end or on a holiday, landlords may obtain a temporary CAO by submitting the required affidavit.

The office of the Director of Health for the City of Stamford has instituted these procedures to protect the rights of

---

7. Alternatively, if one tenant does not vacate until a Friday, a CAO would not be issued until Monday at the earliest, which also might be after the new tenant has occupied the premises.

landlords and tenants and to implement the purposes of the ordinance. Having been established by the authority charged with the administration of the ordinance, such procedures are entitled to great weight in the interpretation of the ordinance. Udall v. Tallman, 380 U. S. 1, 16–17, 85 S.Ct. 792, 13 L.Ed.2d 616 (1965). In practice, landlords apparently have not encountered delays in obtaining CAO's.

Nor have tenants been quick to assert section (b) of the ordinance as a defense to actions for rent. Counsel for plaintiffs has informed the court that he has been unable to test his legal theory directly since no tenant has yet refused to pay rent, relying upon the ordinance as a defense.

Finally, a construction of the ordinance by a state court that would prevent landlords from recovering rent for the balance of the tenancy if the CAO were obtained even one day late is so unlikely that the court cannot consider it a realistic possibility.[8] Indeed, section (b) of the ordinance by its express terms contemplates—and approves—situations in which a tenant moves into an apartment before the landlord has actually obtained the required CAO: " . . . provided, no provision of this ordinance shall be construed to prohibit human occupancy of such apartment during the pendency of an application for such certificate." The Connecticut courts are certainly able to eschew overly technical statutory constructions which would interfere with the clear purpose of the legislation. See Kiely v. Ragali, 93 Conn. 454, 106 A. 502 (1919); Cusack v. Laube & Co., Inc., 104 Conn. 487, 133 A. 584 (1926). The purpose of the statute and ordinance here challenged is to enforce minimum standards of maintenance and repair for rental housing, not to exact Draconian penalties for what might be an involuntary failure to obtain the certificate that the premises meet the required standards. We are confident that the Connecticut courts will not disregard the real purpose of the statute.[9]

■ We conclude, therefore, that plaintiffs' fears are more imaginary than real. Plaintiffs were unable to demonstrate the likelihood of irreparable injury in their application for a temporary restraining order prior to the effective date of the ordinance, and subsequent events have failed to provide them with any grounds for complaint. Moreover, the ordinance does provide several procedural safeguards to protect the interests of landlords. The official responsible for issuing CAO's is specified in the ordinance. The minimum stand-

8. "There are strong reasons to believe that the Connecticut courts would construe [the statute] so as to avoid 'any constitutional doubts. In construing state statutes they apply the rule that the legislature intended to enact a constitutional statute. Cedar Island Improvement Ass'n v. Clinton Electric Light & Power Co., 142 Conn. 359, 372, 114 A.2d 535 (1955); State v. Muolo, 119 Conn. 323, 330, 176 A. 401 (1935); See State ex rel. Rourke v. Barbieri, 139 Conn. 203, 209, 91 A.2d 773 (1952). If there is any reasonable ground on which a statute can be sustained, the Connecticut courts will presume that to have been intended by the legislature. State ex rel. Higgins v. Civil Service Comm., 139 Conn. 102, 90 A.2d 862 (1952)."
Arrow Lakes Dairy, Inc. v. Gill, 200 F. Supp. 729, 736 (D.Conn.1961).

9. See e. g., DeVite v. Connecticut Co., 112 Conn. 670, 151 A. 320 (1930), in which the Connecticut Supreme Court held that failure of a driver to obtain an operator's license does not per se bar him from recovering damages from one who has negligently caused him injury. The court refused to be diverted by the absence of the license; rather, it properly held its focus to the central issue of liability: "The negligence of the operator is to be determined by the facts existing at the time of the accident; whether the operator has a license is a wholly immaterial consideration." Id. at 671, 151 A. at 320. Similarly, landlords should not be barred from recovering rent solely because the Director of Health issues the CAO a few days after the tenant has taken occupancy of the premises. Implementation and enforcement of the statute and ordinance here challenged require attention to the maintenance and repair of premises which are rented, rather than the dates on which certificates are issued.

ards which dwelling units must meet for a CAO to be issued are set out in abundant detail in Chapter 352 of the Connecticut General Statutes and in Chapter 18 of the Stamford City Code. And the ordinance specifically provides for appeals of the decision of the Director of Health: "Any person aggrieved by the refusal of a Certificate of Apartment Occupancy, may appeal to the Court of Common Pleas for Fairfield County, and such appeal shall be privileged."

Where the possibility of landlords being barred from recovering rent by reason of administrative delays in the operation of the ordinance is so remote, any threat to plaintiffs' interests only on that account does not require any procedural safeguards in addition to those now available to them. Compare Board of Regents v. Roth, 408 U.S. 564, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972), with Perry v. Sindermann, 408 U.S. 593, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972).

Accordingly, the complaint is dismissed.

So ordered.

This opinion shall serve as the Court's findings of fact and conclusions of law, under Fed.R.Civ.P. 52(a).