Delanor **BERRY, Jack Bennett, Elmer Jackson, and John Hutson, Perry Scroggins, Ricky Armstrong and all others similarly situated, Plaintiffs,**

v.

**The CITY OF LITTLE ROCK, Defendant.**

**No. LR–C–95–290.**

United States District Court, E.D. Arkansas, Western Division.

Oct. 12, 1995.

Tell Scott Hulett, Little Rock, AR, for plaintiffs.

Stephen R. Giles, City Attorney's Office, Little Rock, AR, for defendant.

### ORDER

EISELE, District Judge.

Before the Court are defendant's Motion to Dismiss [1] and plaintiffs' Motion for a Preliminary Injunction.[2] The plaintiffs in this action are landlords and tenants who own or rent property within the bounds of the City of Little Rock ("City").[3] The City's Code of Ordinances, Chapter 8, provides for building regulations which apply to all buildings in the City of Little Rock. Article V, The Housing Code ("Code"), applies to all residential housing within the City. The ordinance in issue is Ordinance No. 16,659 ("Ordinance")[4] which provides for the systematic inspection of residential properties for the purpose of determining whether Code violations exist. Importantly, the Ordinance provides that:

> "currently the City only inspects premises for housing code compliance upon complaint of suspected code violations; and

1. Originally filed on June 5, 1995 (Docket No. 5) and readopted subsequent to plaintiffs Second Amended Complaint on July 27, 1995 (Docket No. 15).

2. Docket No. 11.

3. The Court notes that the Complaint does not meet the requirements of a class action under the Federal Rules of Civil Procedure or under the Court's Local Rules. It is therefore treated as an action by six individuals named as plaintiffs.

4. The Ordinance was passed on May 17, 1994. See Docket No. 3, Exhibit A (Ordinance).

... a significant amount of the City's housing stock is rental housing which is not maintained in code compliance by the owners because violations are not reported ... many housing code violations existing in the City will not be corrected by the owners unless the City initiates a periodic inspection program ... in the interest of health, safety and welfare of tenants and all citizens of the City of Little Rock, it is necessary that the City institute a program of systematic citywide inspection of rental housing units."

See Ordinance, lines 17–30.

Plaintiffs claim that the City implemented a housing code enforcement program[5] that only targeted low income rental property and that, as a result, only low income property owners are forced into choosing between bringing their property into compliance with the Code or facing "condemnation".[6] Plaintiffs further allege that other owner occupied structures or higher income rental structures are not systematically inspected and that there is no rational basis for the disparate treatment of the plaintiff owners as compared to owner occupiers.[7]

■ The plaintiffs allege that the owner plaintiffs have had to make repairs to their properties and have "accordingly suffered inordinate damages in the form of costs of labor and materials, while many of the code violation findings are unsupportable[8] either in law or fact." Second Amended Complaint, para. 18. Plaintiffs allege that tenants have had to terminate their tenancies because they could not afford the "substantially higher rents" that were necessary "in order to compensate land owners for their repair costs" which has caused a displacement of low income tenants while high income tenants have not been similarly affected. See id at para. 24–25. Plaintiffs further allege that low income tenants have been forced out of rental properties by "condemnation actions." Thus, plaintiffs argue the Ordinance violates the Equal Protection Clause because it is selective, arbitrary and disparate against: (1) low income tenants; (2) owner/landlords as opposed to owner/occupiers; and (3) low income property owners; and that the Ordinance, by its express terms is unconstitutional.[9]

## I. Standing

Before the motion for a preliminary injunction can be considered, the Court must decide the defendant's motion for dismissal based upon the plaintiff tenants lack of standing[10] and the plaintiffs failure to state a claim upon which relief may be granted.[11]

■ The standing inquiry focuses on "whether the litigant is entitled to have the court decide the merits of the dispute of particular issues." *Warth v. Seldin,* 422 U.S. 490, 498, 95 S.Ct. 2197, 2205, 45 L.Ed.2d 343 (1975). Standing does not focus on the merits but is a preliminary jurisdictional requirement necessary to establish that a litigant is entitled to judicial action.[12] When standing

---

5. Under the Department of Neighborhoods and Planning the City has established a division known as the Code Enforcement Task Force.

6. It should be noted that the terms "condemnation" and "condemnation actions" when use by the Court in this Order are not used in their traditional sense (i.e. eminent domain actions). The terms are used by the plaintiffs throughout their Court filings. It is noted by the Court that the Ordinance does not give inspectors the power to "condemn" property but only the power to: one, bring the matter to the City for prosecution; or, two terminate utility service to units containing Life Safety violations. *See* Ordinance § 8–583(f) and (g).

7. Plaintiffs' Second Amended Complaint, para. 22–23 (Docket No. 10).

8. The plaintiffs have not made specific allegations with respect to "unsupportable" Code violations. If a particular landlord contends that there is no factual basis for ordered repairs then the state courts would provide the proper forum for hearing such claims. The Court cannot consider such issues in this action for two reasons: one, it is lacking jurisdiction; and two, the plaintiffs have failed to identify particular circumstances and situations.

9. Plaintiffs' Second Amended Complaint, para. 35, 37–39 (Docket No. 10).

10. Fed.R.Civ.P. 12(b)(1).

11. Fed.R.Civ.P. 12(b)(6).

12. Article III § 2 of the United States Constitution confines the Federal Courts to adjudicating actual "cases" and "controversies." In interpreting that restriction, Federal Courts have de-

is challenged on the basis of pleadings, the Court accepts as true all material allegations of the complaint and construes the complaint in favor of the complaining party. *Pennell v. City of San Jose,* 485 U.S. 1, 7, 108 S.Ct. 849, 855, 99 L.Ed.2d 1 (1988). Constitutionally, a plaintiff can only have standing if he satisfies the "case or controversy" requirement of Article III. *See generally Linda R.S. v. Richard D.,* 410 U.S. 614, 617, 93 S.Ct. 1146, 1148, 35 L.Ed.2d 536 (1973). The Supreme Court has established that for a plaintiff to satisfy the Article III standing requirement, he/she must pass a three-pronged test: first, the plaintiff must have suffered an "injury in fact;" second, there must be a causal connection between the injury and the conduct complained of; and third, it must be likely that the injury will be redressed by a favorable decision. *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 559, 112 S.Ct. 2130, 2136, 119 L.Ed.2d 351 (1992). The plaintiffs bear the burden of establishing these three elements. *Burton v. Central Interstate LLRWC Com'n,* 23 F.3d 208, 209 (8th Cir.1994).

■ In addition to these constitutional requirements, there are three prudential limits on standing. First, the plaintiff must assert his own legal rights and interests, and cannot rest his claim on the legal rights of others. *Valley Forge, Etc. v. Americans United, Etc.,* 454 U.S. 464, 474, 102 S.Ct. 752, 760, 70 L.Ed.2d 700 (1982). Second, the federal courts will not adjudicate abstract questions of wide public significance which amount to generalized grievances. *Id.* Third, the plaintiff's complaint must fall within the zone of interest to be protected or regulated by the statute or constitutional guarantee in question. *Id.*

■ The first prong of the test, the "injury-in-fact" limitation, mandates that the injury satisfy four requirements. First, the injury must be to a "legally protected interest." *Lujan,* 504 U.S. at 560, 112 S.Ct. at 2136. Second, the interest must be "particularized" to the plaintiff. *Id.* Third, the injury must

be likely to occur, not merely speculative. *City of Los Angeles v. Lyons,* 461 U.S. 95, 109, 103 S.Ct. 1660, 1669, 75 L.Ed.2d 675 (1983). Finally, the injury must either be actual or imminent. *Whitmore v. Arkansas,* 495 U.S. 149, 155, 110 S.Ct. 1717, 1722, 109 L.Ed.2d 135 (1990).

■ Here, all plaintiffs allege an interest in the equal protection of the laws. This is a legally protected interest. *See Northeastern Fla. Contractors v. Jacksonville,* 508 U.S. 656, ——, 113 S.Ct. 2297, 2303, 124 L.Ed.2d 586 (1993) (reversing the Court of Appeals denial of standing and noting prior cases that granted standing due to an injury to a person's interest in equal protection of the laws). However, the injury must also be "particularized" meaning that the injury must affect the plaintiff in a personal and individual way. *Lujan,* 504 U.S. at 561 n. 1, 112 S.Ct. at 2136 n. 1. To affect the plaintiff in an individual way the injury must occur specifically to the plaintiff. *See Sierra Club v. Morton,* 405 U.S. 727, 734–35, 92 S.Ct. 1361, 1365–66, 31 L.Ed.2d 636 (1972) (requiring the party seeking review to be among the injured). Said differently, the plaintiff must have a "personal stake" in the outcome of the case. *Baker v. Carr,* 369 U.S. 186, 204, 82 S.Ct. 691, 703, 7 L.Ed.2d 663 (1962).

■ The plaintiff owners [13] satisfy the injury in fact requirement because they argue that they were injured by the Ordinance in one of two ways: (1) the Ordinance has caused tenants to terminate their tenancies (lost rental income), and (2) administration of the Ordinance has uncovered Code violations which, in turn, have resulted in plaintiff owners being required to make repairs to rental properties (damage being cost of labor and materials). These injuries are actual, non-speculative in nature, and personally affect the plaintiff owners.

■ The plaintiff tenants' [14] alleged injuries do not meet the "injury in fact" stan-

---

veloped, among others, the doctrine of standing. *See Allen v. Wright,* 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).

**13.** There are three named plaintiff owners: Delanor Berry, Jack Bennett, and Elmer Jackson.

**14.** There are three named plaintiff tenants: John Hutson, Perry Scroggins, and Ricky Armstrong.

dard. The plaintiff tenants argue that they were injured by the Ordinance in one of four ways: (1) by being forced to pay higher rents to compensate the plaintiff owners for repairs made, (2) by being forced out of the property by "condemnation" or threatened "condemnation action," (3) the costs of relocating, (4) the threatened or actual entry into their leasehold.[15]

The plaintiff tenants have not alleged any specific incidents of any of the above injuries. Importantly, the plaintiff tenants have not alleged a specific instance where the City transcended its authority in terms of accessing properties to conduct inspections.[16] Instead, the following general allegations were made: (1) inspections were commenced without the permission of the owners or their tenants, (2) that several inspection officers informed many of the tenants that they would force entry into their tenements by use of a search warrant if necessary, (3) that tenants were informed that the property they were renting was going to be "closed down" and that they would need to relocate.[17] As pled, these injuries do not affect the plaintiff tenants in an individual way but are instead generalized injuries, not "particularized" to the plaintiff tenants. An individual who alleges a generalized grievance (i.e. an injury shared by many but not suffered by the population as a whole) satisfies the Constitution's personal stake requirement but may be insufficient for standing. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.*, 438 U.S. 59, 80, 98 S.Ct. 2620, 2634, 57 L.Ed.2d 595 (1978) (denying standing due to "prudential concerns"

about hearing "generalized grievance[s]"). The injury is also speculative in that there is not a clear cause and effect relationship between the alleged illegality (enactment and enforcement of the Ordinance) and the alleged harm. *See Allen v. Wright*, 468 U.S. 737, 750, 104 S.Ct. 3315, 3324, 82 L.Ed.2d 556 (1984).[18] The Court finds that the abstract complaints by the plaintiff tenants are not sufficient to bestow standing upon those plaintiffs.

Even if the plaintiff tenants were found to have satisfied the injury-in-fact prong, they have not satisfied the causation prong of the constitutional standing test. The causation inquiry is often identical to the redressability inquiry.[19] The causation inquiry examines the causal connection between the assertedly unlawful conduct and the alleged injury, whereas the redressability inquiry examines the causal connection between the alleged injury and the judicial relief requested.[20] Both owners and tenants must show that the challenged conduct causes the injury. They must also show that the requested relief to the challenged conduct will redress the injury (i.e. redressability).

The tenant plaintiffs have failed to allege how enactment and enforcement of the Ordinance has caused their injuries. First of all, there is no connection between the Ordinance and higher rents being charged by owners of the properties. If an owner must improve his/her property to conform with Code requirements, it is up to the owner to

**15.** *See* Docket No. 21.

**16.** Nor have the plaintiff tenants alleged a violation of their Fourth Amendment rights.

**17.** Docket No. 10, para. 13–16.

**18.** The Court in *Allen* summarized the standing inquiry as follows:

The standing inquiry requires careful judicial examination of a complaint's allegations to ascertain whether a particular plaintiff is entitled to adjudication of the particular claims asserted. Is the injury too abstract, or otherwise not appropriate, to be judicially cognizable? Is the line of causation between the illegal conduct and the injury too attenuated? Is the

prospect of obtaining relief from the injury as a result of a favorable ruling too speculative? *Allen*, 468 U.S. at 752, 104 S.Ct. at 3325.

**19.** *See Haitian Refugee Ctr. v. Gracey*, 809 F.2d 794, 801 (D.C.Cir.1987) (finding the "traceability" and "redressability" requirements to be closely related), *see also New York v. Thomas*, 613 F.Supp. 1472, 1481 (D.D.C.1985) ("[Causation] and redressability are inseparable in the present case because the relief the plaintiffs seek is an [injunction] compelling the [defendant] to end the very action which is the cause of plaintiffs injuries.")

**20.** *See Allen v. Wright*, 468 U.S. 737, 753 n. 19, 104 S.Ct. 3315, 3325 n. 19, 82 L.Ed.2d 556 (1984).

decide how to finance such improvements. The Ordinance does not require an increase in rent. Secondly, even if "tenants are being forced out of the property by condemnation actions" and have relocation expenses such actions and resultant expenses are a result of the Code, not the Ordinance. The Code standards are for the protection of the tenants health, safety and welfare. The standards of the Code stand independent of the Ordinance. There are a number of ways in which Code violations may come to the attention of the Housing Authority (i.e., complaints, visual inspections, reported injuries, reported damages, vandalism etc).

The plaintiff tenants have not demonstrated that the Ordinance is the cause in fact of the "condemnation actions." To the contrary it is the fact that the properties are not maintained according to the Code's standards and that the owners have failed to comply with the Code that has caused the alleged "condemnation actions." [21] It is illustrative that the plaintiff tenants have not linked their tenancies with specific "condemnation actions" or to instances where owners were not given adequate time to bring the property up to Code specifications. Even so, this again, would be a complaint of the plaintiff owners—not the plaintiff tenants. The Court has not been informed whether any of the plaintiff tenants have actually been required to vacate rental property due to "condemnation actions." Notably, the Ordinance does not require immediate "condemnation," merely systematic inspections. Lastly, entry into a leasehold by the City's inspectors is not a violation of the laws and the tenants have failed to argue that any entry was made that exceed the scope of an administrative search warrant.

▆▆▆▆ Not only have plaintiff tenants failed to allege an injury in fact, by they have also failed to show how that injury would be redressed by a favorable decision. Plaintiff tenants would have the Court take it on faith that if the City were enjoined from administering the Ordinance that their landlords would decrease the rent and that the City would ignore the identified Code violations and reverse "condemnation actions" or allow tenants to re-enter "condemned" property. Such actions do not logically result from enjoinment of the Ordinance. Therefore, plaintiff tenants have failed to demonstrate the redressability of their injury.[22]

The plaintiff tenants have not presented a justiciable controversy as required by Article III of the Constitution and as interpreted by the Supreme Court in *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992). The Constitution requires more than plaintiff tenants tenuous claims that they are "being forced to pay higher rents" or "forced out of their properties" by enactment and administration of the Ordinance. The complaint must state more than "bald assertions of injury to survive a motion to dismiss, it must make some effort to connect the [Ordinance] to real injuries that the [plaintiffs] have suffered or will suffer." *Burton v. Central Interstate LLRWC Com'n*, 23 F.3d 208, 210 (8th Cir.1994). At best, the plaintiff tenants have alleged that the Ordinance affects some undefined interest of theirs in an uncertain way. The Court notes that the enactment of the Code and of the Ordinance was for the protection of tenants health, safety and welfare. It seems inapposite that the very class of individuals the Ordinance seeks to protect are now attacking the Ordinance.

▆▆▆▆ In contrast, the plaintiff owners have alleged an "injury in fact" and have pled a causal connection between the injury and the Ordinance.[23] They have moved the Court for a preliminary injunction to prevent further enforcement of the Ordinance along

---

**21.** If the violation is a Life Safety violation, the owner is given 30 days to bring his/her property into compliance. If the violation is not a Life Safety violation, the owner has 120 days to comply with the Code. A building official may lessen the complaint time if he/she deems it necessary. Ordinance § 8–583(d)–(e).

**22.** A plaintiff must always have suffered a distinct and palpable injury that is likely to be redressed if the requested relief is granted. *Gladstone v. Village of Bellwood*, 441 U.S. 91, 99, 99 S.Ct. 1601, 1608, 60 L.Ed.2d 66 (1979).

**23.** Because of the Ordinance, the Code violations of the plaintiff owners have been uncovered and the tenants have been alerted to the fact that their rental units are below minimum Code requirements.

948

with a prayer for equitable relief and compensatory damages.[24] Therefore, the Court finds that the plaintiff owners have standing to challenge the constitutionality of the Ordinance.

The Court finds that the plaintiff tenants lack jurisdiction to challenged the constitutionality of the Ordinance. However, the plaintiff owners have alleged sufficient facts to satisfy the "case or controversy" requirement of Article III. Therefore, defendants motion to dismiss under 12(b)(6) for lack of jurisdiction is GRANTED in part (as to plaintiff tenants) and DENIED IN PART (as to plaintiff owners).

## II.  Equal Protection Analysis

█ The constitutional inquiry begins with a determination of whether the Ordinance "operates to the disadvantage of some suspect class or impinges upon a fundamental right explicitly or implicitly protected by the Constitution." *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 17, 93 S.Ct. 1278, 1288, 36 L.Ed.2d 16 (1973). If it does, then the Ordinance must be examined with strict scrutiny, if not then the framework for the analysis is whether the Ordinance "rationally furthers some legitimate, articulated state purpose and therefore does not constitute an invidious discrimination in violation of the Equal Protection Clause of the Fourteenth Amendment." *Id.*

█ The Ordinance has been regarded by the plaintiffs as discriminating against (1) low income tenants; (2) owner/landlords as opposed to owner/occupiers; and (3) low income property owners. The Court must determine whether the Ordinance discriminated on the basis of owner/landlords or low income property owners[25] and, if so, whether the resulting classification may be regarded as suspect. *Id.* at 18–22, 93 S.Ct. at 1289–90. Suspect classifications include race, national

origin, alienage, indigency, or illegitimacy. *San Antonio Independent School Dist. v. Rodriguez*, 411 U.S. 1, 60, 93 S.Ct. 1278, 1311, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring).

█ "[W]here wealth is involved, the Equal Protection Clause does not require absolute equality or precisely equal advantages." *San Antonio Independent School Dist.*, 411 U.S. at 24, 93 S.Ct. at 1291. Moreover, the Equal Protection Clause does not mandate identical treatment of different categories of persons. *Plyler v. Doe*, 457 U.S. 202, 243, 102 S.Ct. 2382, 2409, 72 L.Ed.2d 786 (1982) (Burger, C.J., dissenting). The states are prohibited by the Equal Protection Clause from discriminating between "rich" and "poor" as such in the formation and application of their laws. *Douglas v. California*, 372 U.S. 353, 359–363, 83 S.Ct. 814, 818–819, 9 L.Ed.2d 811 (1963) (Harlan, J., dissenting). But it is a far different thing to suggest that the Equal protection Clause prevents the City from adopting a law of general applicability that may affect the poor more harshly than it does the rich. *Id.* There is nothing in the record to indicate that the City's Ordinance is drawn on the basis of wealth. The City does not discriminate between rich and poor in having a uniform ordinance that requires all rental properties to be systematically inspected and having a separate rule dealing with owner occupied properties.

█ Neither owners/landlords nor low income property owners are a "suspect class" in this action. Therefore, the City need only show that the Ordinance is rationally related to a legitimate state interest. *Pennell v. City of San Jose*, 485 U.S. 1, 14, 108 S.Ct. 849, 859, 99 L.Ed.2d 1 (1988). The Court will not overturn an Ordinance that does not burden a suspect class or a fundamental interest unless the varying treatment of different groups is so unrelated to the achievement of any combination of legitimate purposes the Court can only conclude that the City's actions were irrational. *Id.*

█ The Ordinances' provisions were designed to serve the legitimate purpose of

---

**24.** Plaintiffs' Second Amended Complaint, Docket No. 10, p. 7.

**25.** Discrimination as to low income tenants will not be examined because the tenants lack standing to challenge the Ordinance.

ensuring that rental housing was being maintained in Code compliance in order to protect the health, safety and welfare of the tenants. The Court cannot conclude that it is irrational to treat rental properties differently from owner occupied properties. The City found that "a significant amount of the City's housing stock is rental housing which is not maintained in code compliance by the owners because violations are not reported." Ordinance at para. 19–22. It is rational for the City to take into account that tenants may not report the sub-Code living conditions of the property they are renting. The application of the Ordinance to rental properties as opposed to owner occupied properties is a reasonable way of utilizing limited enforcement resources and concentrating enforcement activities where they are likely to be needed. *See Hill Construction Company v. Connecticut,* 366 F.Supp. 737, 741 (D.Conn. 1973).

"It is no requirement of the equal protection that all evils of the same genus be eradicated or none at all." *Railway Express Agency, Inc. v. New York,* 336 U.S. 106, 110, 69 S.Ct. 463, 466, 93 L.Ed. 533 (1949). In fact, in the area of social welfare a municipality may address a problem one step at a time or select one phase of one field and apply a remedy there, neglecting others. *See Williamson v. Lee Optical of Oklahoma Inc.,* 348 U.S. 483, 488, 75 S.Ct. 461, 465, 99 L.Ed. 563 (1955). Here, the City chose to target rental properties for the enforcement of minimal standards of maintenance and repair of dwellings. The fact that rental properties where targeted as opposed to owner occupied properties is not, in itself, a cause for complaint.[26] Furthermore, an examination of the Ordinance reveals that low income rental housing has not been singled out for inspection. In fact, inspections are required for *all* rental properties.[27] It is also clear that the City has initiated an inspection program that does not distinguish between low income properties and high income properties.[28] Accordingly, plaintiffs' claim that they have been denied equal protection is rejected. Since this is the only remaining claim, the case will be dismissed.

IT IS THEREFORE ORDERED that Plaintiffs' Motion for a Preliminary Injunction[29] be, and is hereby, DISMISSED AS MOOT.

IT IS FURTHER ORDERED that Defendant's Motion to Dismiss[30] be, and is hereby, GRANTED.

---

**26.** As Mr. Justice Stewart noted:

There is hardly a law on the books that does not affect some people differently from others. But the basic concern of the Equal Protection Clause is with state legislation whose purpose or effect is to create discrete and objectively identifiable classes. And with respect to such legislation, it has long been settled that the Equal Protection Clause is offended only by laws that are invidiously discriminatory—only by classifications that are wholly arbitrary or capricious.

*San Antonio Independent School Dist. v. Rodriguez,* 411 U.S. 1, 60, 93 S.Ct. 1278, 1310, 36 L.Ed.2d 16 (1973) (Stewart, J., concurring).

**27.** "[I]t is necessary that the City initiate a program of systematic citywide inspection of rental housing units." Ordinance, para. 29–30.

**28.** *See* Docket No. 14, Exh. I (affidavit of Jim Hathcock, supervisor of City inspections).

**29.** Docket No. 11.

**30.** Docket No. 15 (adopting Docket No. 5).